**Sheldon Peters WOLFCHILD, et al., Plaintiffs,**

v.

**UNITED STATES, Defendant.**

No. 03–2684L.

United States Court of Federal Claims.

Dec. 16, 2005.

Erick G. Kaardal, Mohrman & Kaardal, P.A., Minneapolis, MN, for plaintiffs. With him on the briefs were William F. Mohrman and Charles R. Shreffler, Mohrman & Kaardal, P.A., Minneapolis, MN.

Benjamin Longstreth, Trial Attorney, Environment and Natural Resources Division, United States Department of Justice, Washington, D.C. With him on the briefs was Thomas L. Sansonetti, Assistant Attorney General, Environment and Natural Resources Division. Of counsel was Angela Kelsey, Department of the Interior, Washington, D.C.

Joseph F. Halloran, Jacobsen, Buffalo, Schoessler & Magnuson, St. Paul, MN, for amicus curiae Prairie Island Indian Community in Minnesota.

Philip Baker–Shenk, Holland & Knight LLP, Washington, D.C. for amicus curiae Shakopee Mdewakanton Sioux (Dakota) Community. Of counsel were Brian B. O'Neill, Richard A. Duncan, and Sarah I. Wheelock, Fagre & Benson, LLP, and Kurt V. BlueDog, Andrew M. Small, and Greg S. Paulson, BlueDog, Olson & Small, PLLP, Minneapolis, MN.

Lower Sioux Indian Community in the State of Minnesota, amicus curiae, pro se, Morton, MN.

Raymond Cermak, Sr., amicus curiae, pro se, Vadnais Heights, MN.

## OPINION AND ORDER

LETTOW, Judge.

This Indian trust case has been brought by over 1,000 individuals claiming descent from Indians in Minnesota who were previously members of the Mdewakanton band of Sioux Indians (the "loyal Mdewakanton"). Pending before the court are sets of motions that stem from the court's prior decision reported as *Wolfchild v. United States*, 62 Fed.Cl. 521 (2004). In that decision, the court denied the government's motion to dismiss plaintiffs' claims of breach of fiduciary duties and for attorney's fees, but granted the government's motion to dismiss plaintiffs' claim for breach of contract and a separately-pled contractual count submitted on behalf of a putative class of minor plaintiffs. Among other things, the court held that the trust claims were preserved by the Indian Trust Accounting Statute, the then-most recent version of which was set out in the Department of Interior and Related Agencies Appropriations Act, Pub.L. No. 108–108, 117 Stat. 1241, 1263 (Nov. 10, 2003), but that the contractual

claims were not so preserved. *Wolfchild,* 62 Fed.Cl. at 547–49.[1] The court also granted plaintiffs' cross-motion for partial summary judgment that (1) a trust was created in connection with, and as a consequence of, provisions in Appropriation Acts for the Department of Interior in 1888, 1889, and 1890 ("Appropriation Acts")[2] that provided money to be expended under specific directions for the benefit of the loyal Mdewakanton and their lineal descendants, which trust included land, improvements to land, and monies as the corpus,[3] (2) such trust was neither extinguished nor terminated by the Act of December 19, 1980, Pub.L. No. 96–557, 94 Stat. 3262 (the "1980 Act"), which converted interests of the United States in the property at issue to a holding in trust for three Indian communities located in Minnesota,[4] and (3) the trust engendered by the Appropriation Acts was breached by the United States through actions taken in December 1980 and thereafter. *See Wolfchild,* 62 Fed.Cl. at 555.

Three different kinds of motions have been filed. In the first motion, Defendant's Motion for Reconsideration ("Recons.Mot."), the government requests that the court reconsider its decision that a trust was created in connection with and as a consequence of the 1888, 1889, and 1890 Appropriation Acts for descendants of persons who met the Appropriation Acts' criteria. Recons. Mot. at 1. The government avers that it has newly retrieved documents that controvert the court's finding that the Appropriation Acts placed property in trust. *Id.* The government also requests that the court reconsider its conclusions regarding the effects of the 1980 Act in light of the further documentary materials being presented. *Id.* The second motion was filed by plaintiffs ("Pls.' Notice Mot.") and seeks to institute a procedure for providing notice to all lineal descendants who are not now named parties in the action, in accord with Rule 14(b) of the Rules of the Court of Federal Claims ("RCFC") and *Hoffmann–La Roche Inc. v. Sperling,* 493 U.S. 165, 170–73, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989) (a federal trial court has a responsibility to

---

1. The Indian Trust Accounting Statute has been enacted as part of the annual appropriations statute for the Department of Interior from 1990 to the present. With minor variations, the form of the Statute has remained comparable to the version in existence at the time this action was filed on November 18, 2003:

   [N]otwithstanding any other provision of law, the statute of limitations shall not commence to run on any claim, including any claim in litigation pending on the date of the enactment of this Act, concerning losses to or mismanagement of trust funds, until the affected tribe or individual Indian has been furnished with an accounting of such funds from which the beneficiary can determine whether there has been a loss.

   Pub.L. No. 108–108, 117 Stat. at 1263; *see Wolfchild,* 62 Fed.Cl. at 534–35 & n. 10.

2. The three Appropriation Acts are the Act of June 29, 1888, 25 Stat. 217, 228–29; the Act of Mar. 2, 1889, 25 Stat. 980, 992–93; and the Act of Aug. 19, 1890, 26 Stat. 336, 349. The pertinent provisions of these Acts are quoted in *Wolfchild,* 62 Fed.Cl. at 527–28 & nn. 4–5.

3. The trust beneficiaries were expressly defined in the Appropriation Acts, *e.g.,* as "Indians in Minnesota heretofore belonging to the Medawakanton [sic] band of Sioux Indians, who have resided in said State since ... [May 20, 1886] ... and have severed their tribal relations." Act of Mar. 2, 1889, 25 Stat. at 992. These Indians were loyal to the United States during the Sioux Outbreak in August 1862 in Minnesota, in which more than 500 white settlers and numerous Indians were killed. *See Wolfchild,* 62 Fed.Cl. at 526. Many of the loyalists lost their homes and property because of their aid to whites, and shortly after the outbreak, Congress concluded that "now they cannot return to their tribe ... or they would be slaughtered for the part they took in the outbreak." *Id.* (quoting *Cong. Globe,* 38th Cong., 1st Sess. 3516 (1864)).

   The statutory reference to the Indians "who have resided in said State since ... [May 20, 1886]," was to a census prepared by U.S. Special Agent Walter McLeod, who acted at the behest of the Commissioner of Indian Affairs to determine those Mdewakanton Indians who were loyal to the United States during the 1862 Outbreak, who had renounced their tribal relations, and who had remained in Minnesota. *See Wolfchild,* 62 Fed.Cl. at 528.

   The beneficiaries included both the loyal Mdewakanton and their families; Congress specified that the appropriated monies were to be applied on behalf of the "Indians *or family thereof.*" Act of Mar. 2, 1889, 25 Stat. at 992 (emphasis added).

   Approximately 1,120 separately named persons have joined this action as plaintiffs. Each such plaintiff claims to be a lineal descendant of a loyal Mdewakanton. *See* Second Amended Complaint, ¶ 2 (Jan. 31, 2005).

4. The full text of the 1980 Act is quoted in *Wolfchild,* 62 Fed.Cl. at 531–32.

oversee joinder of additional parties in an orderly manner). *See* Pls.' Notice Mot. at 1. In that motion plaintiffs seek the court's authorization for a notice to be published informing prospective plaintiffs of the pendency of the action and an order requiring the Department of Interior to provide the names and addresses of each prospective plaintiff known to it. *Id.* A third set of motions was filed by putative *amici curiae* and concern the role of *amici* in this action. Three of the *amici* are Indian communities in Minnesota that obtained interests in the trust property at issue pursuant to the 1980 Act. The posture of the communities in this case gives rise to a question whether summons should be issued to join them as parties pursuant to 41 U.S.C. § 114(b).

For the reasons stated below, the government's motion for reconsideration is denied, plaintiffs' motion for authorization of notice to prospective plaintiffs and for assistance from the Department of Interior in identifying such plaintiffs is granted, and the various motions of *amici curiae* are granted, subject to limitations and to future consideration of issuance of a summons to the Indian communities pursuant to 41 U.S.C. § 114(b).

## BACKGROUND

A severely truncated background is set out to provide context for the pending motions.

### A. Inception of the Trust

This dispute concerns property acquired by the United States for the benefit of those Mdewakanton Sioux who were loyal to the United States during the Sioux Outbreak in Minnesota during 1862. The property at issue consists of land, improvements to land, and monies derived from appropriations expressly and specifically made to benefit the loyal Mdewakanton and their lineal descendants in 1888, 1889, and 1890. In brief, the 1888 Act appropriated $20,000 to be spent by the Secretary of Interior in purchasing land, cattle, horses, and agricultural implements for those full-blooded Mdewakanton who resided in Minnesota on May 20, 1886 and who had severed their tribal relations. Act of June 29, 1888, 25 Stat. at 228–29. The 1889

Act added a further $12,000 and included a provision calling for each loyal Mdewakanton to receive as close to an equal amount as practicable. Act of Mar. 2, 1889, 25 Stat. at 992–93. The 1889 Act called for funds to carry over if the Department of Interior did not spend them by the end of the fiscal year, ensuring that the loyal Mdewakanton would benefit from the appropriation. *Id.* at 992. In the Appropriation Act of 1890, Congress added $8,000 and adopted the same substantive provisions as the 1889 Act, except that it expressly stated that the further appropriated amount was to support Indians of both "full and mixed blood" and it omitted the provision calling for carryover of appropriated but unexpended funds. Act of Aug. 19, 1890, 26 Stat. at 349.

The special circumstances of the loyal Mdewakanton had been recognized by a statute enacted in 1863, shortly after the 1862 Outbreak. The 1863 statute called for the Secretary of Interior to set apart from the public lands "eighty acres in severalty to each individual of the [Mdewakanton and Wapakoota] bands who exerted himself in rescuing the whites from the late massacre [by] said [Sioux] Indians." Act of Feb. 16, 1863, § 9, 12 Stat. 652, 654. Congress also provided that "[t]he land so set apart ... shall be an inheritance to said Indians and their heirs forever." *Id.* This land grant was not successfully implemented. *See* Roy W. Meyer, *History of the Santee Sioux* (1993) ("*History of the Santee*"), at 262–64.[5] As a consequence, the property purchased under the Appropriation Acts was acquired in the name of the United States, and the Department of Interior instituted a system by which tracts were assigned to particular beneficiaries. *See id.* at 275–76. These assignments were documented via "Indian Land Certificates" that described the pertinent tract and certified that the individual assignee "and his heirs are entitled to immediate possession of said land, which is to be held in trust, by the Secretary of Interior, for the exclusive use and benefit of the said Indian, so long as said allottee [sic-assignee] or his or her heirs occupy and use said land." Pls.' Ex. 35

---

5. Portions of the *History of the Santee* have been reproduced as part of the record of this case.

*See Wolfchild,* 62 Fed.Cl. at 528 n. 7 (citing Ex. 4 to Def.'s Motion to Dismiss).

(Indian Land Certificate of Harry Bluestone (June 1, 1905)).[6]

### B. Administration of the Trust

For approximately ninety years, the property acquired by and properties and monies generated from the specially appropriated funds were maintained by the United States for the use and benefit of the loyal Mdewakanton and their lineal descendants. *See Wolfchild*, 62 Fed.Cl. at 529–30. The pertinent tracts became known as the "1886 lands" to reflect the eligible beneficiaries as determined in the census of loyal Mdewakanton conducted by U.S. Special Agent Walter McLeod between May 20, 1886 and September 2, 1886, *see id.* at 528, as supplemented by a subsequent census taken in 1889 by Robert B. Henton, Special Agent for the Bureau of Indian Affairs. *Id.* The 1886 lands were either assigned to particular loyal Mdewakanton or they were leased to others, with proceeds from the leases being collected, held, and then paid over to the loyal Mdewakanton and their heirs. *Id.* at 529–30, 533. This state of affairs changed drastically with the passage of the 1980 Act during a lame-duck session held after the 1980 elections. That Act declared that the 1886 lands were "hereafter [to] be held by the United States ... in trust for [three Indian communities]" that had been formed in Minnesota and recognized by the Department of Interior under the Indian Reorganization Act of 1934, Pub.L. No. 73–383, 48 Stat. 984 (1934) (also known as the Wheeler–Howard Act) (codified in scattered sections of Title 25 of the U.S.Code). *See Wolfchild*, 62 Fed.Cl. at 529–32 (quoting the 1980 Act). A savings clause in the 1980 Act preserved "rights under any contract, lease, or assignment entered into or issued prior to enactment of this Act." 1980 Act, Pub.L. No. 96–557, § 3, 94 Stat. 3262. Thereafter, subject to the savings clause, the three communities took control of the 1886 lands and the accumulated revenues being held by the Department of Interior and managed them for the benefit of the communities, disregarding loyal Mdewakanton. *Wolfchild*, 62 Fed.Cl. at 532–33. Casinos,

hotels, entertainment centers, and other facilities have been constructed and operated by the communities, generating substantial revenue for those entities. *Id.* at 533.

### C. Procedural Context of the Pending Motions

In the concluding portions of the *Wolfchild* decision, the court sought to carry out its responsibilities to oversee joinder of additional parties in an orderly manner. *See Wolfchild*, 62 Fed.Cl. at 554–55 (citing *Hoffmann–La Roche*, 493 U.S. at 170, 171, 110 S.Ct. 482). To that end, the court allowed plaintiffs to file a second amended complaint adding additional named plaintiffs and anonymous plaintiffs, *Wolfchild*, 62 Fed.Cl. at 551–54, addressed plaintiffs' class-certification allegations in the original complaint and required that by a given date "plaintiffs shall either move for class certification or they shall propose means of providing notice in compliance with RCFC 14(b)," *id.* at 555, and required the government by a given date to "inform the court whether it seeks to request that summons be issued pursuant to RCFC 14(a)." *Id.* at 554–55.

The court's requests engendered responses that shape some of the currently pending disputed matters. Plaintiffs filed their Second Amended Complaint. The government filed an answer to the Complaint and Amended Complaint, but not the Second Amended Complaint, and it also submitted its motion for reconsideration. Plaintiffs submitted their motion for approval of notice to interested parties under RCFC 14(b). Plaintiffs did not seek certification of a class. Thereafter, the communities moved for leave to file briefs as *amici curiae*, and the government filed a notice that it did not seek issuance of a summons under RCFC 14(a).

During the ensuing months, the sets of motions were briefed. In particular, after receiving and reviewing the government's motion for reconsideration, the court acted under RCFC 59(b) to request that plaintiffs respond to the portion of the motion that

---

**6.** The volumes of exhibits accompanying the government's motion to dismiss and plaintiffs' response are cited as "Def.'s Ex. ___" and "Pls.' Ex. ___," respectively. The further volumes of exhibits provided by the government in connection with the currently pending motions are cited as "Recons. Ex. ___."

addressed several federal statutes enacted after the Appropriation Acts, particularly statutes adopted in 1906 and 1944, and the portion of the motion that concerned documents reflecting the Department of Interior's implementation of the Appropriation Acts. *See* Order of April 1, 2005. The government had submitted with the motion for reconsideration a sizeable three-volume appendix of documents, some of which were newly provided and some of which had been previously submitted. Plaintiffs responded as requested, and on June 10, 2005, the court held a hearing on the government's motion for reconsideration and on plaintiffs' motion to authorize publication of notice to interested persons who were not already named as plaintiffs. At the hearing, counsel for the government indicated that the government initially had not submitted all of the documentary materials it possessed that related to plaintiffs' claims: "When the [c]ourt previously issued its order, not all of the Department of Interior documents that we have were before [the court]." Hr'g Tr. 41:18–21 (June 10, 2005). However, while additional documents were submitted with the motion for reconsideration, counsel for the government stated that "[w]e are still conducting [a search]—and identifying documents." Hr'g Tr. 41:21–22. Moreover, the government further suggested that the newly provided documents raised, and yet additional records would raise, triable issues of disputed fact regarding the existence of a trust. Hr'g Tr. 42:8–11, 103:3–9. In this respect, the government also proposed that "we would be presenting additional evidence [through witnesses]. We would have historians, who have viewed the various evidence of the Department of Interior's positions, who would offer their expert opinions as to whether or not the lands—whether or not the actions the Department took demonstrate that it's in trust." Hr'g Tr. 103:3–9.

To forestall a continuing, piecemeal submission of documents regarding the Department of Interior's implementation of the Appropriation Acts, the court requested that the government engage in a concerted search for any such additional documentary materials and provide them via a supplemental submission. *See* Orders of June 14, 2005 and

July 7, 2005. Plaintiffs were given a similar opportunity. *Id.* These further submissions were made by plaintiffs on August 5, 2005, and by the government on August 8, 2005. Two of the communities, the Prairie Island Indian Community in Minnesota and the Shakopee Mdewakanton Sioux (Dakota) Community, also sought leave to file a supplemental memorandum as *amici.* As a result of these filings and procedural motions submitted subsequently, the disputed matters have become ready for disposition.

## ANALYSIS

The government's motion for reconsideration takes precedence because the court's prior decision constitutes a necessary predicate for the other two sets of motions before the court.

### A. Reconsideration

This case remains in an interlocutory posture, and consequently the government's motion for reconsideration falls under RCFC 54(b) and RCFC 59(a), rather than under the more rigorous standards of RCFC 59(e). *See Klamath Irrigation Dist. v. United States,* 68 Fed.Cl. 119, 120–21 (2005); *Florida Power and Light Co. v. United States,* 66 Fed.Cl. 93, 95–97 (2005). RCFC 54(b) provides that

> any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and *the order or other form of decision is subject to revision at any time before the entry of judgment* adjudicating all the claims and the rights and liabilities of all the parties.

(Emphasis added.) *See also* Fed.R.Civ.P. 54(b) (identical text). Correlatively, RCFC 59(a)(1) provides that "reconsideration may be granted to all or any of the parties and on all or part of the issues, for any of the reasons established by the rules of common law or equity applicable as between private parties in the courts of the United States." These rules reflect the precept that "[c]ourts possess inherent power to modify their interlocutory orders before entering a final judg-

ment." *Florida Power*, 66 Fed.Cl. at 96 (citing *Marconi Wireless Tel. Co. v. United States*, 320 U.S. 1, 47–48, 63 S.Ct. 1393, 87 L.Ed. 1731 (1943); *John Simmons Co. v. Grier Brothers Co.*, 258 U.S. 82, 88, 42 S.Ct. 196, 66 L.Ed. 475 (1922)). At an interlocutory stage, the common law provides that the court has power to reconsider its prior decision on any ground consonant with application of the law of the case doctrine. *See Florida Power*, 66 Fed.Cl. at 95, 97 (citing *Exxon Corp. v. United States*, 931 F.2d 874, 877 (Fed.Cir.1991)); *Independence Park Apts. v. United States*, 61 Fed.Cl. 692, 699 (2004) (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815–16, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988)).

"The law of the case doctrine ... 'protect[s] the settled expectations of the parties and promote[s] orderly development of the case.'" *Independence Park*, 61 Fed.Cl. at 699 (quoting *Suel v. Sec'y of Health & Human Servs.*, 192 F.3d 981, 984 (Fed.Cir.1999)) (internal quotation marks omitted). "Reasons that may warrant departure from the law of the case ... include the discovery of new and different material evidence that was not presented in the prior action, or an intervening change of controlling legal authority, or when the prior decision is clearly incorrect and its preservation would work a manifest injustice." *Intergraph Corp. v. Intel Corp.*, 253 F.3d 695, 698 (Fed.Cir.2001) (citing *Smith Int'l Inc. v. Hughes Tool Co.*, 759 F.2d 1572, 1576 (Fed.Cir.1985)).

With this standard for application of the law of the case doctrine in mind, the court will address the government's motion for reconsideration. To prevail on its motion for reconsideration, the government must provide evidence showing that one of the three traditional elements of a trust—a trustee, beneficiaries, and trust property—is lacking, or at a minimum is placed in doubt. *See Restatement (Third) of Trusts* § 2 cmt. f (2003). "Where ... the relevant sources of substantive law create '[a]ll of the necessary elements of a common-law trust,' there is no need to look elsewhere for the source of a

trust relationship." *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 476 n. 3, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003) (quoting *United States v. Mitchell*, 463 U.S. 206, 225, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983)).

### 1. *The Appropriation Acts.*

█ The government's motion for reconsideration puts forward several contentions that the court had previously addressed and rejected. First, the government rehashes numerous references to the language and legislative history of the Appropriation Acts in an attempt to show the absence of an intent to create a trust. Defendant argues that the absence of the term "trust" in the Appropriation Acts is a fatal flaw in finding the existence of a trust. *See* Recons. Mot. at 18–19. This argument ignores a basic principle of the law of trusts that indicates that the term "trust" need not be used where the elements of a common law trust are present. *See Restatement (Third) of Trusts* § 13 cmt. a; *White Mountain Apache*, 537 U.S. at 476 n. 3, 123 S.Ct. 1126 (affirming a determination that a money-mandating fiduciary relationship existed between the United States and the White Mountain Apache Tribe).

Second, the government argues that the "charitable" elements of the appropriations, as well as legislative history indicating a "charitable" purpose, means that the appropriations could not have been intended to provide the bases of a trust. *See* Recons. Mot. at 18–22; *see also* Recons. Ex. 3E (51 Cong. Rec. 7586 (1890) (statement of Sen. Dawes)) ("the money is distributed from time to time as in the judgment of the Department the needs of the Indians require it ... as charity is doled out the door of the benevolent man"). The government's argument suggests that trusts may not be created for merely charitable purposes. This reasoning is in direct conflict with traditional trust law. *See, e.g., Restatement (Third) of Trusts* § 15 ("Consideration Not Required to Create Trust").[7]

---

7. In full, Section 15 of the *Restatement (Third) of Trusts* provides that "[t]he owner of property can create a trust of the property by will or by declaration or transfer *inter vivos*, whether or not

consideration is received for doing so." *See also Restatement (Third) of Trusts* § 28 cmt. b ("[T]here are no restrictions on the right of property owners to create charitable trusts that are

Third, the government argues that two of the three appropriations were intended to be spent within a short time span (a year or less), and therefore a trust could not have been intended. Recons. Mot. at 18, 20–22. Defendant further contends that the elimination of the "carry-over" provision in the 1890 Act indicates that its inclusion in the 1889 Act could not have been indicative of a trust. *Id. Compare* Act of Mar. 2, 1889, 25 Stat. at 992, *with* Act of Aug. 19, 1890, 26 Stat. at 349 (both quoted in *Wolfchild,* 62 Fed.Cl. at 527–28 & nn. 4–5). The government points to a statement by Senator Dawes with respect to the 1890 Act that "[t]his will all be expended within the year. There is no doubt about it. Why these words have been put on there I do not know, and I have not the slightest care whether the word remain in or go out." Recons. Ex. 3E (51 Cong. Rec. 7591 (1890)); *see also* Recons. Mot. at 21. Senator Dawes made this statement during a debate about the wisdom of extending the 1890 appropriation beyond one year. The amount appropriated in 1890, $8,000, was 25 percent of the amount previously appropriated in 1888 and 1889 (totaling $32,000). *See supra,* at 782. However, Congress' intent to have the funds appropriated by the 1890 Act to be expended within one year does not also show that Congress had the negative intention that the *property purchased with these funds* would not be held by the United States in trust for the benefit of the loyal Mdewakanton. The reason Senator Dawes provided for eliminating the carry-over was the generic policy concern that appropriated funds should not be continued "without specifying the amount of appropriations from unexpended balances from year to year. I prefer to know how many dollars we expend and for what." Recons. Ex. 3E (51 Cong. Rec. 7587 (1890)). Finally, with regard to Congress' intent, during this same debate, Senator Teller proposed that funds for the Mdewakanton should be provided out of the general Sioux fund rather than having a separate appropriation. *Id.* This suggestion was rejected in favor of a separate fund for the loyal Mdewakanton, indicating that the beneficence provided to loyal Mdewakanton was considered entirely separately from support for other Sioux groups. *Id.* at 7586–91.

Fourth, the government contends that Congress could not have intended to create a trust by way of the 1888, 1889, and 1890 Acts, because Congress provided for a special agent to supervise the funds, thus showing that it "knew that there was 'no Indian agent for these Indians.'" Recons. Mot. at 21 (quoting 51 Cong. Rec. 7586 (1890)). This argument cuts against the government's position rather than for it. Congress was well aware that the loyal Mdewakanton had severed their tribal relations and that there was no Indian agent assigned to them. A special agent had to be provided to manage and apply the funds. In effect, Congress designated a specific trustee, because each of the Appropriation Acts named the Secretary of Interior as the responsible party and authorized him to "appoint a suitable person" to carry out the directed expenditures. *See* Act of June 29, 1888, 25 Stat. at 229 (quoted in *Wolfchild,* 62 Fed.Cl. at 527 n. 4).[8] There is no dispute that the Department promptly instituted an assignment arrangement for providing the 1886 lands to the beneficiaries for their use, and that the Indian Land Certificates setting out the assignments specified that the lands were "held in trust" by the Secretary of Interior. *See supra,* at 783 (quoting Pls.' Ex. 35 (Indian Land Certificate of Harry Bluestone (June 1, 1905))).

Fifth, and lastly, the government argues that the 1888, 1889, and 1890 Acts provide a "changing and indefinite description of the beneficiary group" such that the beneficiaries are too lacking in specificity for a trust to be created. Recons. Mot. at 19–20 (citing *Restatement (Third) of Trusts* § 2 cmt. h ("[I]f property is transferred upon an intended private trust and no definite or validly ascertainable beneficiaries are provided, no express trust is created.")). This claim is unavailing. Each of the Appropriation Acts

---

not equally applicable to the creation of private trusts.").

**8.** Moreover, contrary to the implication in the government's argument, to create a trust, tradi-

tional trust law would not require Congress to name any specific trustee at all. *See Restatement (Third) of Trusts* § 31 ("A trust does not fail because no trustee is designated.").

relied on the census taken in 1886. These lists were treated as authoritative by the Department of Interior, which used the census data in determining who would benefit from the amounts appropriated. *See Wolfchild,* 62 Fed.Cl. at 528. Moreover, only the 1888 Act referred to "full-blood Indians." Act of June 29, 1888, 25 Stat. at 228. The 1889 Act referred to "these Indians or family thereof," and the 1890 Act referred to "full and mixed blood." *See Wolfchild,* 62 Fed.Cl. at 527 & nn. 4–5 (quoting the Acts).[9] In this respect, the Department's implementation of the Appropriation Acts consistently referred to those listed in the 1886 census, as supplemented by the 1889 census, and their descendants. *See Wolfchild,* 62 Fed.Cl. at 528–30.[10] The government would introduce an element of confusion and obfuscation where there was none in the contemporaneous actions of the Department.

### 2. *Subsequent enactments.*

■ The government draws upon several subsequent enactments as evidence of Congress' understanding of the Department's implementation of the Appropriation Acts. This court previously addressed an Act passed in 1901, *see Wolfchild,* 62 Fed.Cl. at 528–29, 541, but it did not consider statutes enacted in 1906, 1923, and 1944. Each will be considered in turn.

#### (a.) *1901 Act.*

The Act of Feb. 25, 1901, 31 Stat. 805, concerned one of the tracts encompassed by the 1886 lands. Some of the land purchased for the Mdewakanton was not arable; one parcel was next to a brickyard where many Mdewakanton worked, and its only usable resource was clay. *Wolfchild,* 62 Fed.Cl. at 528–29. The 1901 Act empowered the Secretary of the Interior to sell that tract, provided that "the written consent of the adult Indians residing in Redwood County, Minnesota, shall first be given." Act of Feb. 25, 1901, 31 Stat. at 806. This court concluded that the 1901 Act effectively constituted an explicit recognition by Congress that a trust had been created and funded by the appropriations made under the 1888, 1889, and 1890 Acts. *Wolfchild,* 62 Fed.Cl. at 541.

The government contends that the provision in the 1901 Act for the consent of only those loyal Mdewakanton residing in Redwood County, Minnesota, and not all of them, implicitly suggests that Congress did not believe the land was held in trust for *all* of the loyal Mdewakanton. Recons. Mot. at 23. Two points militate against this interpretation. First, to the extent that this sale could be seen as a partial termination of the trust, requiring the consent of the beneficiaries for partial termination of a trust is a basic precept of traditional trust law. *Wolfchild,* 62 Fed.Cl. at 541 (citing *Restatement (Third) of Trusts* § 65(1)). While traditional trust law

---

9. For the context underpinning these references, *see History of the Santee,* at 276–77. The *History of the Santee* states that "the great majority of the Sioux in Minnesota were of mixed blood, and there was no reliable way to discriminate among people with varying degrees of Indian ancestry." *Id.* at 277.

10. The 1886 census as supplemented by the 1889 census supplies a presumptive starting point for identifying the loyal Mdewakanton and their descendants, but these census rolls may not be definitive. The court has deferred proceedings on eligibility pending completion of steps to provide notice to potential plaintiffs in this collective action. Regarding eligibility and the census rolls, the government has stated its

> understanding that neither [the 1886 nor the 1889] roll includes the mixed-bloods who were included in the 1890 Act. Defendant has identified one later document that identifies some mixed-blood members. Ex. B [Letter from

Robert B. Henton, Special Agent, to Birch Cooley, Commissioner of Indian Affairs (March 3, 1893)]. Correspondence from Robert Henton and others also indicates that some individuals who were not on the rolls should be eligible and that some who were on the rolls should not be. *See* Ex. C [Letter from Robert B. Henton to Birch Cooley (March 15, 1889)].
Defendant's Response to Plaintiffs' Proposed Notice to Potential Plaintiffs and Opposition to Plaintiffs' Motion for Order Requiring the United States to Provide a List of Known Lineal Descendants ("Def.'s Notice Resp.") at 6.
The government has also stated its position that "individuals who had joined a tribe other than the three Mdewakanton Communities would not be eligible because they do not meet the criteria for severing their tribal relations. Similarly, someone whose parents were members of a different tribe would not meet the criteria either." *Id.* None of those matters have been addressed in detail by the parties or the court.

generally requires that any termination of a trust requires the consent of all beneficiaries, *see Restatement (Third) of Trusts* § 65, those loyal Mdewakanton living in Redwood County at the time of the sale would have been the most likely to be affected by the sale, and therefore they represented the best proxy regarding the opinion of all of the loyal Mdewakanton. Secondly, this sale of property was actually more akin to an exchange of one piece of property for another rather than a partial termination—the statute directed the Secretary "to purchase other lands in said county for said Indians with the proceeds arising from such sale." Act of Feb. 25, 1901, 31 Stat. at 806. Viewed from this perspective, the 1901 transaction constituted management of the trust corpus and may not have required the approval of the beneficiaries at all.

### (b.) *1906 Act.*

The government raises the Act of March 19, 1906, Pub.L. No. 59–58, 34 Stat. 78 ("1906 Act"), for the first time in its Motion for Reconsideration. *See* Recons. Mot. at 23. That Act "authorized and directed" the sale of a tract of the 1886 lands to the State of Minnesota.[11] The government claims that the 1906 Act refutes the existence of a trust in two different ways. First, unlike the 1901 Act, the 1906 Act does not require the permission of the Mdewakanton for the sale to take place. Recons. Mot. at 23. Second, defendant claims that the language used in the 1906 Act (*i.e.*, "certain Sioux Indians" and "proposed allottees [sic-assignees]") shows that the property was purchased for specific Indians and not for the loyal Mdewakanton as a whole. *Id.*

As for the government's first claim, the sale of land to the State of Minnesota does not appear to have been a partial termination of the trust. The land was transferred to the State of Minnesota at the request of the State because the pertinent land adjoined the grounds of a state asylum, and the asylum required the land. *See* Recons. Ex. 5B (H.R.Rep. No. 59–1636, at 1 (1906)). The particular tracts had apparently been assigned for use by specific individuals, but no land certificates had ever been issued to those individuals. *Id.* at 2–4 (citing letter of C.F. Larrabee, Acting Commissioner, Office of Indian Affairs, to Secretary of Interior (January 30, 1906)). The 1906 statute specifically directed that the Indians who were to have been assigned these lands were to be paid compensation, or furnished with lieu lands. 1906 Act, § 2, 34 Stat. at 78. Accordingly, the transfer involved in the 1906 Act does not appear to be a partial termination of a trust but merely an exchange of trust property (the 40 acres) for other property (lieu lands or cash).[12]

With respect to the government's second claim, the arrangement put in place by the 1906 statute reflects the assignment system implemented by the Department of Interior in its management of the 1886 lands. *See infra*, at 783. Specific members of the loyal Mdewakanton were assigned one or more parcels of the 1886 land for their beneficial use. The actions under the 1906 statute were also consistent with the Department of Interior's policy, in its management of 1886

---

11. In pertinent part, the 1906 Act provides:
   [T]he Secretary of the Interior ... is hereby ... authorized and directed to sell and convey unto the State of Minnesota, under such provision as he may direct, and for such compensation as he may deem adequate, the following tract of land, which was heretofore purchased by the United States for the purpose of allotting [sic] the same to certain Sioux Indians, residing in the State of Minnesota, situated in the county of Dakota and State of Minnesota, described as follows, to wit: Southeast quarter of the southeast quarter of section twenty-seven, township numbered one hundred and fifteen, range seventeen [40 acres]: *Provided*, That the land shall not be sold at less than the appraised value.

   SEC. 2 That the proceeds arising from the sale of such land shall, if the Secretary of the Interior so elect, be paid to said proposed allottees [sic-assignees] or their representatives, or lieu lands purchased for them elsewhere.
   Pub.L. No. 59–58, 34 Stat. 78.

12. To the extent that this transfer would be considered a partial termination of the trust, the payment of compensation to the assignees is consistent with the existence of a trust. However, to the extent that particular assignees accepted cash in lieu of other property, those assignees arguably relinquished some rights as beneficiaries.

lands, of handling assignments after an assignee died. The next assignment was typically made to heirs of the deceased, although the heirs had no rights of inheritance. *See infra*, at 793–94.

### (c.) *1923 Act.*

The Act of Feb. 14, 1923, Pub.L. No. 67–412, 42 Stat. 1246 ("1923 Act"), bears on allotments rather than assignments and thus on first impression would seem to have no relevancy to the 1886 lands and the loyal Mdewakanton. By the 1923 Act, Congress extended the allotment provisions of the Dawes Act "to all lands heretofore purchased or which may hereafter be purchased by authority of Congress for the use or benefit of any individual Indian or band or tribe of Indians." *Id.*

The Act of Feb. 8, 1887, 24 Stat. 388, also known as the "Dawes Act," authorized the President to allot lands in severalty to Indians who were living on reservations. *Id.* at 388. For years, this statute did not pertain to the 1886 lands because the 1886 lands were not associated with a reservation. However, the 1923 Act arguably provided authority for the Department of Interior to allot the 1886 lands to individuals among the loyal Mdewakanton. Contemporaneous writings of officials of the Department of Interior indicate that the Department understood the 1923 statute as providing that authority. *See* Defendant's Supplemental Filing in Support of its Motion for Reconsideration ("Def.'s Supp.") Ex. 58 (Letter of E.B. Merritt, Assistant Commissioner, Indian Affairs, to Ora Padgett, Superintendent of Pipestone School (Mar. 6, 1924)). However, it appears that the Department of Interior never took steps to exercise authority under the 1923 Act to allot the 1886 lands. Assistant Commissioner Merritt stated in his letter of March 6, 1924 that "[w]hile there is sufficient authority of law under the Act of February 14, 1923 (Public 412) to allot these lands, it is not believed to be practicable to do so at this time, and no change will be made at this time in the method of assigning these tracts." *Id.*[13] In the absence of any action on the part of the Department of Interior to allot the 1886 lands under the authority of the 1923 Act, the trust status of the 1886 lands was unaffected.

The 1923 Act might have been used by the Department of Interior to change the character of the 1886 lands but in actuality had no effect on them. The Department's adherence to the special nature of the 1886 lands was consistent from 1890 to 1980.

### (d.) *1944 Act.*

In its Motion for Reconsideration, the government invokes the Act of June 13, 1944, Pub.L. No. 78–335, 58 Stat. 274 ("1944 Act") for the first time. *See* Recons. Mot. at 24. The 1944 Act addresses a sale of a tract of the 1886 lands. The particular tract contained about 110.24 acres, and the sale was being made such that the tract might become part of the Upper Mississippi River Wild Life and Fish Refuge. 1944 Act, § 1, 58 Stat. at 274.[14] The transaction in effect au-

---

**13.** The Department of Interior's authority to allot reservation lands to individual Indians was terminated in connection with passage of the Indian Reorganization Act, Pub.L. No. 73–383, § 1, 48 Stat. 984, (1934) (codified at 25 U.S.C. § 461) ("hereafter no land of any Indian reservation ... shall be allotted in severalty to any Indian").

**14.** The 1944 Act provides, in pertinent part, that:

the Secretary of the Interior ... is ... authorized to acquire, for and as part of the Upper Mississippi River Wild Life and Fish Refuge, ... those tracts of land situated in Wabasha County, Minnesota, described as lots 6 and 10 ... containing approximately one hundred and ten and twenty-four one-hundredths acres, *which tracts of land were acquired pursuant to authority contained in the Acts of June 29, 1888* (25 Stat. 228), *and March 2, 1889* (25 Stat.

992), *for Indian use*, but are no longer used by Indians.

SEC 2. In order to carry out the provisions of section 1 hereof, the sum of $1,261.20 from funds heretofore made available to the Fish and Wildlife Service for the purchase of lands for the Upper Mississippi River Wild Life and Fish Refuge is hereby made available for transfer on the books of the Treasury of the United States to the credit of the Medawakanton and Wahpakoota Bands of Sioux Indians ... and said sum, when so transferred, shall operate as *a full, complete, and perfect extinguishment of all their right, title, and interest* in and to the lands above described, and *shall be subject to disbursement under the direction of the Secretary of the Interior for the benefit of the Medawakanton and Wahpakoota Bands of Sioux Indians.* Where groups of such Indians are organized as tribes under the Act of June

thorized the sale and transfer of the tract from the United States to the United States. In short, the only change was to the use of the tract. In that respect, the 1944 Act specifically recites that the transfer will operate as a "full, complete and perfect extinguishment" of all the "right, title, and interest" that the Mdewakanton and Wahpakoota bands have had in the tract. 1944 Act, § 2, 58 Stat. at 274. This recitation does not specify what "right, title, and interest" the Mdewakanton had in the land, but it assuredly suggests that they had some interest, notwithstanding the fact that the United States held title to the tract. *See id.* The language of the statute is thus fully consistent with the existence of a trust.

Furthermore, the 1944 Act directed that the proceeds be disbursed to the Mdewakanton and Wahpakoota bands and it additionally implied that all such Indians were not organized into tribes under Indian Reorganization Act of 1934. In that regard, the 1944 Act specifies that "[w]here groups of such Indians are organized as tribes under the Act of June 18, 1934 ..., the Secretary of the Interior may set apart and disburse for their benefit and upon their request a proportionate part of said sum, based on the number of such Indians so organized." 1944 Act, § 2, 58 Stat. at 274.[15] The strong implication is that where the Indians are *not* so organized, then a different payment scheme would be necessary, proportionate to the number of Indians not so organized. The court accordingly rejects the government's contention that Congress understood that if the land was held in trust at all, it was held in trust for the bands and not the lineal descendants. Additionally, the House report accompanying this statute indicated that the Secretary of Interior understood that special legislation was needed by Congress to transfer the lands: "These lands cannot be acquired or transferred in the usual manner as their use

has been fixed by Congress." Recons. Ex. 6A (H.R.Rep. No. 78–1122, at 1–2 (1944)(citing letter of Secretary of Interior Ickes (April 23, 1943))). Each of these elements of the 1944 Act is consistent with the existence of a trust.

The government also implies that inclusion of the "Wahpakoota" band indicates that a trust was not created exclusively for the loyal Mdewakanton. *See* Recons. Mot. at 24–25. This approach ignores the fact that the Mdewakanton and Wahpakoota were sometimes considered together because the two bands previously had existed in close proximity and for most purposes had been indistinguishable. Some members of both had been loyal during the 1862 Outbreak. *See History of the Santee,* at 258 (referring to the "Mdewakanton and Wahpekutes" without distinguishing between them); *see also, e.g., Medawakanton and Wahpakoota Bands of Sioux Indians, Otherwise Known as Santee Sioux Indians v. U.S.,* 57 Ct.Cl. 357, 360, 1922 WL 1863 (1922) ("[T]he Medawakantons and Wahpakootas lived together practically as one band."); *id.* at 367, 1922 WL 1863 ("There were some members of the Medawakanton and Wahpakoota Bands, who were reputed friendly to the whites, who never removed from Minnesota after the outbreak.").

Defendant contends that the 1944 Act provides evidence that no trust existed. The government states that, as with the 1906 Act, Congress did not require the consent of the Mdewakanton to effectuate the sale of the land, therefore indicating that the land was not held in trust status. In this respect, the 1944 transfer of lands, like the 1901 transfer, was of a relatively small parcel that no assignee was using. This transfer does not appear to be a partial termination of a trust, but rather an exchange of certain trust property (land) for other property (cash).[16]

---

18, 1934 (48 Stat. 984), the Secretary of the Interior may set apart and disburse for their benefit and upon their request a proportionate part of said sum, based on the number of such Indians so organized.
Pub.L. No. 78–335, 58 Stat. 274 (1944) (emphasis added).

**15.** The Indian Reorganization Act was designed to permit Native Americans to form federally-recognized tribes and to transfer the functions of the Department of Interior and the Office of Indian Affairs regarding tribal reservations to the tribes. *See* H.R.Rep. No. 73–1804, at 6 (1934).

**16.** However, to the extent that the monies received might have been paid out, the transfer

In sum, the further acts that followed the 1888, 1889, and 1890 Appropriation Acts do not weaken or remove the conclusion that the Appropriation Acts engendered a trust for the benefit of the loyal Mdewakanton. Rather, the 1901, 1906, 1923, and 1944 Acts strengthen that conclusion because they are consistent with the existence of a trust.

### 3. The Department of Interior's implementation.

In *Wolfchild*, the court concluded that numerous documents submitted by plaintiffs "reflect[ed] the Department of Interior's pre–1980 interpretation of the 1888, 1889, and 1890 Acts, namely, that the United States held the 1886 lands in trust for the loyal Mdewakanton and their lineal descendants." *Wolfchild*, 62 Fed.Cl. at 542. The government did not at that time submit any evidence to controvert this claim. With its Motion for Reconsideration, the government seeks to provide new documentary evidence that it avers puts at issue whether the Department of Interior understood that the 1886 lands were held in trust. Recons. Mot. at 25–36. Although many of these documents are not new, and the court has already considered them, *see Wolfchild*, 62 Fed.Cl. at 528–30, 541–42, the court will reconsider its prior ruling in light of the entire body of documentation that the government has now submitted. Those documentary materials fall into four general categories: (1) the Indian Land Certificates that were issued by the Department to individual assignees; (2) the materials associated with the so-called "1915 Debates," a series of departmental memoranda that dealt primarily with the ability of certain lineal heirs of eligible Mdewakanton to inherit specific land assignments; (3) other pre–1980 letters and memoranda: and (4) adjudications by departmental officials of individual claims of rights by descendants of loyal Mdewakanton.

### (a.) The Indian Land Certificates.

To the court, the most persuasive evidence of what the Department of Interior thought it was doing with the funds provided by the Appropriation Acts is found in the Indian

Land Certificates issued to individual assignees of parcels of the 1886 lands. From inception through December 1980, those Land Certificates specified and certified that the individual assignee "and his heirs are entitled to immediate possession of said land [*i.e.*, a particular tract described in the Certificate], *which is to be held in trust, by the Secretary of Interior*, for the exclusive use and benefit of said Indian, so long as said allottee [sic-assignee] or his or her heirs occupy and use said land." *Supra*, at 783 (quoting Pls.' Ex. 35 (Indian Land Certificate of Harry Bluestone (June 1, 1905))). Those Indian Land Certificates expressly recognized the existence of a trust, and they reflected an understanding by departmental officials that there was (1) a trustee—the Secretary of Interior, (2) a defined set of beneficiaries—the loyal Mdewakanton and their heirs, and (3) a trust corpus—the 1886 lands and proceeds derived from those lands. The necessary elements of a common-law trust are thus present. *See White Mountain Apache*, 537 U.S. at 476 n. 3, 123 S.Ct. 1126; *Restatement (Third) of Trusts* § 2 cmt. f.

### (b.) The "1915 Debate."

Against the background of the assignments evidenced by the Indian Land Certificates, the "1915 Debate" was a series of internal communications within the Department of Interior to determine whether children had the right to inherit the land assignments that had been made to their parents, or whether the lands could be reassigned to another beneficiary. *See* Recons. Ex. 10–20. The government focuses primarily on two of the communications, both made by E.B. Merritt, Assistant Commissioner of the Office of Indian Affairs. The first of these communications was a memorandum dated April 2, 1915 from Assistant Commissioner Merritt, with the approval of Bo Sweeney, Assistant Secretary of Interior, addressed to the Secretary of Interior. Recons. Ex. 17. In this memorandum, Mr. Merritt concludes that under the terms of the Certificates, "there [sic] were merely 'tenancies at will' and, as such, not inheritable." *Id.* at 1. This statement by

---

pursuant to 1944 Act could be considered a partial termination of the trust, with the payment of

compensation to beneficiaries.

itself says nothing about the existence of a trust *vel non.* The government relies on the following paragraph to show that no trust existed at all:

> The Secretary of Interior has not been authorized to hold these lands in trust for the Mdewakanton Sioux. These lands may not be disposed of as trust lands. They may not be sold with the approval of the Secretary of Interior, and both legal and equitable title are in the United States.

*Id.* at 3. The government selectively focuses on the first and last sentences of the above quote. *See* Recons. Mot. at 26. The quote, however, is internally contradictory. The paragraph states that the 1886 lands may not be sold by action of the Secretary, implying, in context, that Congressional action for a sale was necessary because of the designation in the Appropriation Acts of specific beneficiaries. This limitation on the Secretary's power is also consistent with the history already established by way of the 1901 and 1906 Acts. The 1915 memorandum nonetheless states that both legal and equitable title are in the United States. Recons. Ex. 17, at 3. The memorandum does not seek to reconcile this statement with the prior recitation that the Secretary of Interior was not free to dispose of the lands. *See id.* That limitation is itself consistent with trust status, respecting a trustee who had limitations on managing and dealing with the trust corpus.

The second memorandum on which the government focuses particular attention is a memorandum dated September 30, 1915 from Assistant Commissioner Merritt, again with the approval of Bo Sweeney, addressed to the Secretary of Interior. Recons. Ex. 20. The government places emphasis on Merritt's conclusion that "it was the result of the legislation authorizing these purchases [the 1888, 1889, and 1890 Acts], that the land be disposed of in a manner which was deemed best by the Secretary ... and that he deemed it best not to dispose of any permanent interest in these lands pending further legislation which has not been enacted." *Id.* at 6; *see* Recons. Mot. at 26–27. This statement does not address whether or not the lands were held in trust. The pending issue was whether specific Mdewakanton had a vested interest in particular tracts upon the termination of an assignment, or whether the Secretary might reassign a tract to other loyal Mdewakanton in his discretion. *See* Recons. Ex. 20 at 2.

### (c.) *1933, 1937, 1970 Letters and Memoranda and 1979 Report.*

The government points to other communications that took place within the Department of Interior regarding the status of the 1886 lands during the period from 1933 through 1979. These communications relate primarily to the reassignment of specific tracts of the 1886 lands. In a letter dated September 22, 1933, from John Collier, Commissioner of Indian Affairs, to James W. Balmer, Superintendent of Pipestone Indian School, Commissioner Collier notes that "[t]he title to these tracts is in the United States, assignees or their heirs possessing only the right of occupancy and use." Recons. Ex. 21. Additionally, Commissioner Collier requests that Superintendent Balmer investigate a claim that a parcel of Mdewakanton lands "is being denuded of the timber by a white man." *Id.* A request such as this, directing that the lands be protected from spoliation from a non-Mdewakanton, is consistent with trust status.

The government also cites a series of communications made during 1937 between the Superintendent of Pipestone Indian School and the Office of Indian Affairs regarding reassignment of a tract of land that had been abandoned by its Mdewakanton assignee. *See* Recons. Mot. at 29. A memorandum for the Solicitor from F.H. Daiker, Assistant to the Commissioner of Indian Affairs, dated November 3, 1937, states that "[t]he lands were purchased for the Indians by the United States. No trust is created in the deeds. Neither the land nor the Indians are subject to the jurisdiction of any organized Indian community." Recons. Ex. 23. These statements are contradictory. That the government acquired title to the 1886 lands without any designation that it was acting as trustee has no significance to the question whether a common-law trust was created as a consequence of the Appropriation Acts. Also, with

respect to the particular tract addressed by the 1937 letter, apparently rental income in the amount of $26 was derived from the property and that income was directed to the individual whose assignment was being cancelled, rather than being divided among all of those who qualified under the Appropriation Acts. *See* Recons. Exs. 24 (Letter from J.W. Balmer, Superintendent of Pipestone Indian School to Joseph Graham (Nov. 11, 1937)), 24A (Letter from William Zimmerman, Jr., Assistant Commissioner, Land Division, Indian Affairs, to Balmer (Mar. 28, 1938)). This payment represented "rental money" that was held "on deposit to [the assignee's] credit at [Pipestone Indian School]." *Id.* at 2. It is unremarkable that funds generated by the property during the time that the property was assigned to a particular individual would be paid out to that individual.

A memorandum from the Assistant Solicitor, Indian Legal Activities, to the Field Solicitor, Minneapolis, dated December 4, 1970, concerns land management laws of the Shakopee Mdewakanton Sioux Community. Recons. Ex. 25. The government cites a part of the memorandum that states that "the lands in question were acquired in the name of the United States without trust designation or other limitation in title." *See id.* at 1; Recons. Mot. at 29. The government claims that this passage indicates that the lands were not held in trust for the Mdewakanton. However, later in this same memorandum, the Assistant Solicitor states that "the land acquired pursuant to [the 1888, 1889, and 1890] appropriation acts was for the use of certain Mdewakanton Sioux Indians ... [T]he land in question remains available only for the use of qualified Mdewakanton Sioux Indians." Recons. Ex. 25, at 1. This memorandum, albeit internally inconsistent, is reflective of the large body of documentary material before the court regarding trust status.[17]

Finally, a report on the 1886 lands prepared in October 1979 by the National Technical Service Foundation and funded by the Bureau of Indian Affairs recites that: "This Act [the 1889 Appropriation Act] put the Medewakantons in a unique position—they were to have land owned by the United States, but not in a trust status, nor a reservation upon which they were forced to live." Recons. Ex. 28, at 1–16. The implication of this statement, as the government would have it, is twofold: first, that if the lands were not explicitly placed in trust by the Appropriation Acts there could be no trust, and, second, absent reservation status there could be no trust. Both premises are wrong. The government made a similar suggestion in its oral arguments, *i.e.,* that the appropriation statutes' requirement that the Secretary of Interior spend the appropriations for the benefit of the Mdewakanton amounted to no more than an administrative limitation or requirement, the implementation of which by the Department of Interior must be given *Chevron*-type deference by this court. *See, e.g.,* Hr'g Tr. 19:8–22 (referring to *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). This argument ignores that principles of traditional trust law do not require explicit trust language for a trust to be formed, and as previously stated, the court rejects the government's premise that if the Appropriation Acts do not specifically use the term "trust" then no trust could be created, furthermore, the existence of a reservation is not an essential element of a trust for the benefit of Indians. This is a unique case, involving Indians who had severed their tribal relationship and thus had neither a reservation nor a tribal organization.

(d.) *The role of the communities prior to 1980 and heirship decisions thereafter.*

In carrying out its responsibilities respecting the 1886 lands, the Department of Interi-

---

17. Notably, and of potential significance for future development of this case, the memorandum of the Assistant Solicitor goes on to state that "[t]his limitation on the use of the lands would persist even if we were to conclude that the governing body of the Shakopee Mdewakanton Sioux Community has the power to make assign-ments, as distinguished from recommending assignments, of the lands." Recons. Ex. 25, at 2. It is at least arguable that the circumstance envisioned by the Assistant Solicitor in 1970 is that which exists today under the terms of the 1980 Act. *See Wolfchild,* 62 Fed.Cl. at 544 n. 13.

or adopted the general practice of making an assignment on the death of an assignee, to the assignee's children or one of them, but the Department of Interior took the position that heirs had no right to inherit the assignment, and that the tract could be re-assigned to another Mdewakanton at the discretion of the Department. *See, e.g.*, Recons. Ex. 20 (Memorandum from Assistant Commissioner Merritt, with the approval of Bo Sweeney, Assistant Secretary of Interior, to the Secretary of Interior (Sept. 30, 1915)).

The practice of the Department of Interior in issuing Indian Land Certificates was not changed by the establishment of the three communities organized under the Indian Reorganization Act. Those communities, the Shakopee Mdewakanton Sioux Community, the Prairie Island Indian Community, and the Lower Sioux Indian Community, were allowed to play an advisory role to the Department of Interior in determining individuals' eligibility for assignments. *See Wolfchild*, 62 Fed.Cl. at 529–30. Officials within the Department of Interior opined on more than one occasion prior to the 1980 Act that the communities had no authority to make assignments. In one memorandum regarding the land management laws of the Shakopee Mdewakanton Sioux Community, a Field Solicitor stated in 1970 that "the Shakopee–Mdewakanton Community has no land to manage. Insofar as the so-called 'Mdewakanton lands' are concerned, the Community has no authority whatsoever to assign or otherwise deal with them. This authority is in the Secretary of Interior or his authorized representative." Def.'s Supp., Ex. 87 (Memorandum from Daniel S. Boos, Field Solicitor, Twin Cities, to Area Director, Bureau of Indian Affairs, Minneapolis (Aug. 5, 1970)), at 2. These limitations were consistent with the Indian Reorganization Act, which stated that "[t]he existing periods of trust placed upon any Indian lands and any restriction on alienation thereof are extended and continued until otherwise directed by Congress." 25 U.S.C. § 462.

The Department of Interior's practice of issuing certificates designating an assignment continued until passage of the 1980 Act. *See* Recons. Ex. 29 (Memorandum of Law,

*In the Matter of the Estate of Mamie Bluestone Gofas*, Indian Probate No. IP TC 389S–81 (Oct. 26, 1990)), at 34. The 1980 Act included a savings clause that the Department of Interior treated as preserving the land assignments that existed prior to the passage of the 1980 Act. *Wolfchild*, 62 Fed. Cl. at 532–33; *see* 1980 Act, § 3, 94 Stat. at 3262. Following the enactment of the 1980 Act, a number of probate claims were brought by heirs of deceased assignment holders, seeking to establish vested property rights in the land assignments. *See, e.g., Gofas, supra; Brewer v. Acting Deputy Assistant Sec'y—Indian Affairs*, 10 I.B.I.A. 110 (1982); *Gitchel v. Minneapolis Area Dir.*, Bureau of Indian Affairs, 28 I.B.I.A. 46 (1995). In each of these instances, the Department of Interior concluded that the holder of an Indian Land Certificate received no vested interest in the land that was susceptible of testamentary disposition. None of those cases addressed or even touched upon the issues presented in this case regarding the existence or not of a trust.

### 4. *Synopsis.*

The government has shown no grounds for overturning this court's prior determination that a trust was created in connection with the 1888, 1889, and 1890 Appropriation Acts for the benefit of the loyal Mdewakanton and their descendants. The provisions of the 1901, 1906, 1923, and 1944 Acts support this result, as do the documentary materials related to the Department of Interior's implementation of the Appropriation Acts over a period of ninety years, until December 1980 when the 1980 Act was enacted. Moreover, contrary to the government's contentions, the records of the Department of Interior that have been provided to the court regarding implementation of the Appropriation Acts do not raise a genuine dispute of material fact respecting the existence of a trust. Finally, the government's expressed desire to call historians as witnesses to offer opinions as to whether a trust was created, *see supra*, at 784, does not serve to create a genuine dispute where none appears from the documents themselves. The government's argument in this regard was not an actual proffer of evidence because the argument was not supported by any affidavits or declarations

from particular historians, nor were specific areas of potential dispute identified. Thus, the government's vague, amorphous suggestion adds nothing to the case and is wholly unavailing.[18]

## B. NOTICE AND IDENTIFICATION OF KNOWN DESCENDANTS

In accord with the court's earlier decision and the Supreme Court's observation in *Hoffmann–La Roche,* 493 U.S. at 170–71, 110 S.Ct. 482, that a federal court has a responsibility to oversee joinder of additional parties in an orderly manner, the parties and the court have endeavored to craft a procedure for providing notice to all lineal descendants who are not now named parties in the action. In plaintiffs' notice motion they have sought (1) authorization from the court to publish a notice informing prospective plaintiffs of the pendency of the action, and (2) an order requiring the Department of Interior to provide the names and addresses of all descendants of loyal Mdewakanton known to the Department. Pls.' Notice Mot. at 1. The government has responded with proposed modifications to the notice put forward by plaintiffs, while resisting any requirement that it identify descendants of loyal Mdewakanton known to it. Def.'s Notice Resp. at 1–12.

### 1. Notice.

RCFC 14(b) sets out a basic approach to giving notice to persons who may have an interest in a pending action.[19] Plaintiffs aver that due process requires that effective means be employed to provide all potential plaintiffs with notice of the pending litigation, that notice given in accord with RCFC 14(b) should be one of the means to satisfy that obligation, and that additional means necessarily also must be employed in the circumstances of this case. Pls.' Notice Mot. at 17.

RCFC 14(b) assumes that the names and addresses of the interested parties are known. Based upon that assumption, the rule essentially prescribes the form of notice and the means of service of that notice on the known persons.[20] The type of notice addressed by RCFC 14(b) is satisfactory and shall be applied to this case, but in practical terms this type of notice is of limited utility to the circumstances at hand. The chief problem in this instance is reaching an indefinite number of persons who may be descendants of loyal Mdewakanton but who as yet have no knowledge of this action.

An analogous rule, RCFC 23(c) regarding class actions, provides a starting point for analyzing the type of notice appropriate for reaching unknown persons who might be interested in the action.[21] Plaintiffs have

---

**18.** In these circumstances, the court need not decide whether the testimony of historians on such an issue would be proper expert testimony under Fed.R.Evid. 702. That evidentiary rule contemplates receipt of "specialized" knowledge as well as "scientific" and "technical" knowledge, but testimony of historians in this context would raise numerous issues of methodology, objectivity, and reliability. *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141–42, 147–49, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

**19.** RCFC 14(b) states, in pertinent part:

(b) Notice to Interested Parties.
(1) The court, on its own motion or on the motion of a party, may notify any person with legal capacity to sue and be sued and who is alleged to have an interest in the subject matter of any pending action. Such notice shall advise of the pendency of the action and of the opportunity to seek intervention and to assert an interest in the action.
. . .
(3) The motion for notice shall *state the name and address of such person and set forth the*

*interest that such person appears to have in the action.*
(Emphasis added).

**20.** RCFC 14(b) has no counterpart in the Federal Rules of Civil Procedure.

**21.** RCFC 23(c) states, in pertinent part:
For any class certified under RCFC 23(b), the court must direct to class members the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice must concisely and clearly state in plain, easily understood language:
● the nature of the action,
● the definition of the class certified,
● the class claims, issues, or defenses,
● that a class member may enter an appearance through counsel if the member so desires,
● that the court will include in the class any member who requests inclusion, stating when and how members may elect to be included, and
● the binding effect of a class judgment on class members under RCFC 23.

raised class allegations, styling themselves as the "Indian Class Beneficiary [sic]," *see* Second Amended Complaint at 50, but plaintiffs state that they do not seek class certification at this time. *Id.* at 50–51. In all events, RCFC 23(c) is not directly applicable because it pertains to "any class certified under RCFC 23(b)," *see* RCFC 23(c)(2)(B), and no such class has been certified. Nonetheless, the general admonition in the rule to provide "the best notice practicable in the circumstances" serves as a guide to the requirements of due process in this instance.

The issue of notice in this case is similar in many respects to that in *Hoffmann–La Roche*. That case involved a suit under the Age Discrimination in Employment Act of 1967, Pub.L. No. 90–202, 81 Stat. 602 (codified, as amended, at 29 U.S.C. §§ 621–634) ("ADEA"), in which an employer had discharged or demoted some 1,200 employees. *Hoffmann–La Roche*, 493 U.S. at 167–68, 110 S.Ct. 482. One of these employees brought an age discrimination suit under the ADEA on behalf of himself and all those similarly situated.[22] *Id.* To ensure that all potential plaintiffs would receive notice, plaintiffs moved that the trial court order discovery of the names and addresses of all similarly situated employees. *Id.* at 168, 110 S.Ct. 482. The trial court determined that it was appropriate to facilitate notice and ordered the employer to produce the names and addresses of the discharged employees. *Id.* at 168–69, 110 S.Ct. 482. The Supreme Court confirmed the trial court's discretion to participate in the notice process, noting that the circumstances of that case illustrated "the propriety, if not the necessity, for court intervention in the notice process." *Id.* at 169–70, 110 S.Ct. 482. Although *Hoffmann–La Roche* was a collective action under the

ADEA and not a class action, the court drew an analogy to the rules pertaining to class actions and its precedents relating to those rules. " '[B]ecause of the potential for abuse, a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and the parties.' " *Id.* at 171, 110 S.Ct. 482 (quoting *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981)). The Supreme Court noted that the Federal Rules of Civil Procedure "provide further support for the trial court's authority to facilitate notice. Under the terms of Rule 83, courts, in any case 'not provided for by rule,' may 'regulate their practice in any manner not inconsistent with' federal or local rules. Rule 83 endorses measures to regulate the actions of the parties to a multiparty suit." *Hoffmann–La Roche*, 493 U.S. at 172, 110 S.Ct. 482 (quoting *Gulf Oil*, 452 U.S. at 99 n. 10, 101 S.Ct. 2193).

Another case involving plaintiffs situated somewhat similarly to those in the case at hand was *Quinault Allottee Association and Individual Allottees v. United States*, 197 Ct.Cl. 134, 453 F.2d 1272 (1972). In *Quinault*, a group of Indian plaintiffs sued the federal government, seeking to recover administrative charges the government was deducting from the proceeds of sales of timber from individual allotments of land. *Id.* at 1273. The group of named plaintiffs averred that it could fairly and adequately protect the entire group of potential plaintiffs, which consisted of over one thousand allottees. *Id.* at 1274.[23] The interest of the allottees varied from full ownership over one or more allotments to fractional interests in a single allotment. *Id.* at 1273–74. Notably, the Court of Claims observed that most of the potential

---

RCFC 23(c)(2)(B).

**22.** The ADEA contains a provision that specifically allows for such collective suits: "[A]n action 'may be maintained against any employer ... in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated.' " *Hoffmann–La Roche*, 493 U.S. at 167–68, 110 S.Ct. 482 (quoting 29 U.S.C. § 216(b)).

In this action, joinder of many plaintiffs is appropriate because each plaintiff claims to be a descendant of a loyal Mdewakanton, and the

plaintiffs assert a right to relief jointly arising out of the same transaction, occurrence, or series of transactions or occurrences. *See* RCFC 20(a).

**23.** At the time of the decision in *Quinault*, the Court of Claims had not yet adopted a rule for class actions akin to Fed.R.Civ.P. 23. Nevertheless, in the Court of Claims' view, the absence of such a rule did not constitute an impediment to using the class-action procedure, so long as relief was confined to a money judgment. *See Quinault*, 453 F.2d at 1274–75.

plaintiffs lived on or near a reservation and participated in tribal affairs, and it concluded that they were likely to be aware of the circumstances that led to the suit against the government. *Id.* at 1276. The Court of Claims in *Quinault* found that it would be proper to provide the allottees with notice of the suit so that they might easily "opt in" to the class if they chose to bear the risks and costs of the suit, although the court determined that it would not be proper to force potential plaintiffs affirmatively to "opt out" or be bound by the judgment. *Id.* at 1276.

Taken together, *Hoffmann–La Roche* and *Quinault* provide this court with broad discretion to issue notice in multiparty suits. Accordingly, this court will allow plaintiffs to provide the "best notice practicable under the circumstances, including individual notice to all [persons] who can be identified with reasonable effort" in conformity with RCFC 23(c)(2)(B), *Hoffmann–La Roche,* and *Quinault.* The notice and a specific set of instructions regarding such notice are set out in Appendix A to this Opinion and Order.

*2. Identifying known lineal descendants.*

■ Plaintiffs request that the court require the government to provide a list of the lineal descendants of which the government is aware, at no expense to plaintiffs. *See* Pls.' Notice Mot. at 25. The government objects to any such requirement, and it particularly resists any reliance by this court on the "Call Statute," 28 U.S.C. § 2507, arguing that the grant of authority to this court under that statute has been largely superseded by adoption of discovery procedures. Def.'s Notice Resp. at 12–13. Since this court's inception in 1855, it has been vested with authority to "call upon any department or agency of the United States or upon any party for any information or papers, not privileged, for purposes of discovery or for use as evidence." 28 U.S.C. § 2507(a).[24] Over the years, the Call Statute has enabled the court to address a variety of circumstances in which aid of governmental agencies or the parties was necessary to determine the monetary liabilities of the federal government: "[I]t has been deemed necessary by Congress that the court should have power to obtain the essential information from the various departments of the Government to enable it intelligently to adjudicate the matters coming before it . . . [C]ases [concerning the official action of some department or officer of the government] can not be properly and fully adjudicated without the court having before it the official record of the transaction as contained in the files of the department in which the case originates." *Robinson v. United States,* 50 Ct.Cl. 159, 164, 1915 WL 1096 (1915).

In the case at hand, a full disclosure by the government of those persons it knows may be potential plaintiffs in this action would be helpful in providing notice to those persons entitled to join in this case. Production of such a list would both advance the discovery process and potentially serve as substantive evidence in its own right. Additionally, to accord with procedural due process, it is crucial that potential plaintiffs be identified and provided notice of the suit. *See Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314–15, 70 S.Ct. 652, 94 L.Ed. 865 (1950).[25] Protection of potential plaintiffs'

---

**24.** The Call Statute initially was enacted in 1855 as the eleventh section of the original organic act of the Court of Claims. *See* Act of Feb. 24, 1855, § 11, 10 Stat. 612, 614. In its present form, the statute provides as follows:

§ 2507. Calls and discovery

(a) The United States Court of Federal Claims may call upon any department or agency of the United States or upon any party for any information or papers, not privileged, for purposes of discovery or for use as evidence. The head of any department or agency may refuse to comply with a call issued pursuant to this subsection when, in his opinion, compliance will be injurious to the public interest.

(b) Without limitation on account of anything contained in subsection (a) of this section, the court may, in accordance with its rules, provide additional means for the discovery of any relevant facts, books, papers, documents or tangible things, not privileged.

(c) The Court of Federal Claims may use all recorded and printed reports made by the committees of the Senate or House of Representatives.

28 U.S.C. § 2507.

**25.** Where information is sought to enhance notice rather than to define issues in the case, the Supreme Court has stated that Rule 23 may be the appropriate source of authority for an order requiring a defendant to help identify the members of a class of plaintiffs. *See Oppenheimer Fund, Inc., v. Sanders,* 437 U.S. 340, 350, 98

rights is especially important where, as here, the government owes a fiduciary duty as trustee to the beneficiaries "to keep and render clear and accurate accounts with respect to the administration of the trust." *Restatement (Second) of Trusts*, § 172 (1959); *see also* Indian Trust Accounting Statute, Pub.L. No. 108–108, 117 Stat. 1241, 1263 (abrogating the statute of limitations for individual trust beneficiaries to receive an accounting of trust funds held by the government). In this court, the Call Statute provides explicit authority for enlisting defendant's aid in identifying potential plaintiffs.[26]

The question also arises whether the court should require plaintiffs to bear the Department of Interior's costs in furnishing a list of descendants known to the government. Regardless of whether the request for the list is considered to be for the purposes of discovery or for purposes of providing notice to prospective plaintiffs, the Supreme Court has stated that the costs of providing such information need not be shifted to a plaintiff where "the expense involved may be so insubstantial as not to warrant the effort to calculate it and shift it to the representative plaintiff" or where "the task ordered is one that the defendant must perform in any event in the ordinary course of business." *Oppenheimer Fund*, 437 U.S. at 359, 98 S.Ct. 2380. In the case at hand, circumstances militate against requiring plaintiff to reimburse the government for the information to be provided. First, plaintiffs ask only for a list of descendants of which the government is already aware. All that is required of the government is to produce a list of descendants that is already known. Furthermore, the United States historically maintained a

list of known descendants to assist it in determining eligibility for land assignments in the 1886 lands. Given these circumstances, the costs to the government of providing the list should be small, and the costs of doing so will not be shifted to plaintiffs.[27]

## C. ROLE OF THE COMMUNITIES

### 1. *Motions to file* amicus *briefs.*

The Shakopee Mdewakanton Sioux (Dakota) Community and the Prairie Island Indian Community jointly submitted a motion for leave to file an *amicus* brief in support of defendant's motion for reconsideration, and these communities submitted a brief and an appendix of exhibits concurrently with their filing on April 11, 2005. Subsequently, on June 6, 2005 these communities filed a motion for leave to file an *amicus* reply brief and to amend and extend their previously proffered appendix. Additionally, the Lower Sioux Indian Community filed a Motion To Proceed Pro Se on October 3, 2005, in essence seeking permission to appear as *amicus curiae* independently of the other two communities.

The motions to file *amicus* briefs recite that the Shakopee Mdewakanton Sioux (Dakota) Community and the Prairie Island Indian Community "understand that they have ongoing permission to file *amicus* briefs" based upon the court's prior decision in this case. Motion of Shakopee Mdewakanton Sioux (Dakota) Community and Prairie Island Community For Leave to File an *Amicus* Reply Brief and to Amend the Appendix to their *Amicus* Brief in Support of Defen-

---

S.Ct. 2380, 57 L.Ed.2d 253 (1978). In the case at hand, however, a class has not been certified and the call for information is directed not just to providing notice to potential plaintiffs, but also to discovery of relevant evidence.

**26.** Thus, the question of authority posed in *Hoffmann–La Roche* does not arise here. In that case, the district court had ordered the employer-defendant to provide the names and addresses of all employees who had not yet joined suit and to send them a court-approved "notice and consent document, with a text and form approved by the court." *See Hoffmann–La Roche,* 493 U.S. at 169, 110 S.Ct. 482.

**27.** Plaintiffs request that the government provide a list of known lineal descendants, but do not request that the government be required to send notice to the known lineal descendants. Rather, plaintiffs have stated their willingness to send court-authorized notice to each of the known lineal descendants. *See* Pls.' Notice Mot. at 33. This comports with the Supreme Court's cautionary observation in *Oppenheimer Fund* that the representative plaintiff in a class action should bear all costs relating to the sending of notice, except where such costs are not substantial. *See Oppenheimer Fund,* 437 U.S. at 359, 98 S.Ct. 2380 (citing *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974)).

dant's Motion for Reconsideration, at 2. This recitation is accurate only insofar as it acknowledges the court's prior detailed consideration of the role of the *amici*. *See Wolfchild*, 62 Fed.Cl. at 536–37. At that time the court considered a motion for leave to file memoranda as *amicus curiae* from the Lower Sioux Community, the Shakopee Mdewakanton Sioux (Dakota) Community, the Prairie Island Indian Community, and Mr. Raymond Cermak. *Id.* The court noted in its decision that "[u]nlike intervention under RCFC 24(a), there is no right to participate as an *amicus curiae*; the decision 'is left entirely to the discretion of the court.'" *Id.* at 536 (quoting *Fluor Corp. v. United States*, 35 Fed.Cl. 284, 285 (1996)). In determining whether to grant the motions to participate as *amici*, the court considered a number of factors, including whether the parties opposed the motions, the strength of information and argument presented by the potential *amici*, the partisanship of the moving entities, the adequacy of the current representation, the timeliness of the motions, and the usefulness of information and argument presented by the potential *amici*. *Wolfchild*, 62 Fed.Cl. at 536 (citing *Fluor*, 35 Fed.Cl. at 285; and *American Satellite Co. v. United States*, 22 Cl.Ct. 547, 549 (1991)). The court ultimately found that on balance, these factors weighed in favor of granting the motions of the prospective *amici*. However, at that time the court stated that the participation of the *amici* would be limited to filing the briefs that were then being proffered.[28] The court specifically required that "[f]or the [*amici*] to participate in any manner extending beyond the filing of the proffered briefs, they must file motions explaining the specific benefits to the court of their proposed additional contribution to the proceedings in this case." *Id.* at 537. In their currently proffered submissions, the Shakopee Mdewakanton Sioux (Dakota) Community and the Prairie Island Indian Community have disregarded this limitation.

Nonetheless, despite their failure to adhere to the court's previously stated limitations, the court will accept the *amicus* briefs proffered by the Shakopee Mdewakanton Sioux (Dakota) Community and the Prairie Island Indian Community. However, for the future the communities shall adhere to the court's limitations. The *amici* are not parties. Consequently, they have no right to participate in the case.

The pending motion by the Lower Sioux Indian Community has a quite different basis. The Lower Sioux Indian Community has moved for permission to appear as *amicus curiae* independently of the other two communities and to do so *pro se*. *See* Motion To Proceed Pro Se filed by Lower Sioux Indian Community (Oct. 3, 2005).[29] That motion is also granted, but, again, only for purposes of the briefing of the pending reconsideration and notice motions.

Any person or entity seeking to file briefs or memoranda as an *amicus* in this case in the future must specifically seek leave from the court to do so at least 21 days in advance of the filing of the papers, and any entity seeking to file papers as *amicus curiae* must be represented by counsel.

2.  *Potential summons to the communities under 41 U.S.C. § 114(b).*

The Shakopee, Prairie Island, and Lower Sioux Indian Communities all obtained interests in the trust property at issue pursuant to the 1980 Act. *See Wolfchild*, 62 Fed.Cl. at 530–33. What that interest is remains uncertain at this stage of the proceedings. Given that the United States breached its fiduciary obligations to the loyal Mdewakanton when it acted under the 1980 Act to convey an interest in the trust corpus that in effect divested the descendants of the loyal Mdewakanton of their benefits, it is possible that the government will have to pay compensation to the descendants of the loyal Mdewakanton. Depending upon the outcome, the government may also be in a position to recoup some

---

28. The court also noted the communities were arguably eligible to intervene under RCFC 24(a)(2), but none of them had moved to do so. *Wolfchild*, 62 Fed.Cl. at 536 n. 11.

29. The Lower Sioux Indian Community notes that it initially filed an *amicus* brief prepared by counsel who also represented the Prairie Island Indian Community, but that it no longer is represented by that counsel. *See* Motion To Proceed Pro Se.

value from the communities. To date, although the communities have been extraordinarily active in this case as *amici,* indeed, exceeding the normal role of *amici,* none of them has chosen to intervene in this case under RCFC 24(a)(2).[30] Thus far, the government also has opted not to cause the communities to be summoned into the case under RCFC 14(a)(1).[31] This does not, however, preclude the possibility that the communities may be brought into the case.

Under 41 U.S.C. § 114 (originally enacted as Section 14 of the Contract Settlement Act of 1944, Pub.L. No. 78–395, § 14, 58 Stat. 649, 663), the court acting *sua sponte* or on motion, has authority to summon a third party in certain circumstances.[32] One of the situations in which Section 114(b) has been invoked is where the government may have transferred property erroneously or disbursed or paid over funds to the wrong party, and the property or funds have been put at issue in the case at hand. In *Maryland Casualty Co. v. United States,* 135 Ct.Cl. 428, 141 F.Supp. 900 (1956), the question presented was whether the government, being sued for money which the government at one time held in its hands but which the government had disbursed to a third party under a mistake of fact or law, had the legal right under Section 114(b) to have the third party brought into the case. *Id.* at 901. With joinder, if the government lost to the original plaintiff, the government might simultaneously obtain a judgment against the third party to recover the money erroneously paid over. *Id.* In *Maryland Casualty,* the Court

of Claims determined that the history of the Contract Settlement Act indicated that Section 114(b) was created to promote judicial economy by avoiding repetitive litigation of the same issues, as well as to protect the government from potentially inconsistent judgments. *See id.* at 902–04 (analyzing the legislative history of the Act, including statements by the Attorney General regarding the bill that became the Contract Settlement Act). Based on this determination, the Court of Claims found that the government could move to have such a third party brought into the case and that the court had authority to grant such a request. *Id.* at 905–06. Subsequent decisions have reaffirmed this position. *See Southern Cal. Edison Co. v. United States,* 226 F.3d 1349, 1355–56 (Fed.Cir.2000); *Bowser, Inc. v. United States,* 190 Ct.Cl. 441, 420 F.2d 1057, 1062–63 (1970); *Christy Corp. v. United States,* 181 Ct.Cl. 768, 387 F.2d 395, 397–98 (1967); *Seaboard Sur. Co. v. United States,* 144 Ct.Cl. 686, *cert. denied,* 359 U.S. 1001 (1959).

There are limits, however, regarding the types of relationships that may cause third parties to be summoned under Section 114(b). The Federal Circuit and the Court of Claims have construed Section 114(b) to require that the claim against the third party must be "derived through the contract or claim upon which the [original] plaintiff instituted suit," *Oliver–Finnie Co. v. United States,* 133 Ct.Cl. 555, 137 F.Supp. 719, 721 (1956), unless "the third party appears and asserts a claim or an interest in a claim against the United States." *Bowser,* 420

---

**30.** RCFC 24 states, in pertinent part:

(a) Intervention of Right. Upon timely application anyone shall be permitted to intervene in an action: ... (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

**31.** In pertinent part, RCFC 14(a) provides:

(a) Summoned Parties.
(1) On motion of the United States, the court may summon any third person against whom the United States may be asserting a claim or contingent claim for the recovery of money paid by the United States in respect

of the transaction or matter that constitutes the subject matter of the suit to appear as a party and defend the third party's interest, if any, in such suit.

**32.** Section 114 of Title 41 states, in pertinent part:

(b) Procedure
The United States Court of Federal Claims, on motion of either of the parties, or on its own motion, may summon any and all persons with legal capacity to be sued to appear as a party or parties in any suit or proceeding of any nature whatsoever pending in said court to assert and defend their interests, if any, in such suits or proceedings, within such period of time prior to judgment as the United States Court of Federal Claims shall prescribe.

F.2d at 1062; *see also Southern Cal. Edison,* 226 F.3d at 1355–56; *United States v. Rush,* 804 F.2d 645, 646–47 (Fed.Cir.1986).[33]

In the case at hand, the communities appear to fall within the jurisdictional ambit of Section 114(b). The interests of the communities involve the same trust property that is the subject of plaintiffs' claim. Additionally, the communities obtained their interests in the trust property pursuant to the 1980 Act, which the court has determined led to a breach of the trust that was created as a consequence of the Appropriation Acts of 1888, 1889, and 1890. Given the communities' interest in the trust property, it may, in the future, be prudent to issue a summons to the communities. However, there is no need now to reach a decision in that regard. Moreover, prior to any such decision, the communities and the parties should be provided a full opportunity to be heard. To that end, the court may, at a later date, issue an order requesting the communities to show cause why they should not be issued summonses to appear as parties under 41 U.S.C. § 114(b).

## CONCLUSION

For the reasons stated above, the government's motion for reconsideration of the court's prior decision dated October 27, 2004, is DENIED. Plaintiffs' motion to institute a procedure for providing notice to all lineal descendants who are not now parties in this action is GRANTED, as is plaintiffs' request for an order directing the Department of Interior to provide the names and addresses of each prospective plaintiff known to it (*i.e.,* persons not already named as plaintiffs). The form of notice to be provided is set out at Appendix A to this decision, and such notice shall be given at plaintiffs' expense. The Department of Interior shall provide the names and addresses of each prospective plaintiff on or before April 17, 2006.

The motions of the Shakopee Mdewakanton Sioux (Dakota) Community and the Prairie Island Indian Community for leave to file briefs as *amici* in support of defendant's motion for reconsideration are GRANTED. The motion of the Lower Sioux Indian Community to appear as *amicus curiae pro se* independently of the other two communities is GRANTED. However, any person or entity seeking to file briefs or memoranda as *amicus curiae* in this case in the future, including the communities, must specifically seek leave to do so at least 21 days in advance of the proposed filing of such briefs or memoranda, and any entity seeking so to file must be represented by counsel.

The government shall file its answer to Plaintiffs' Second Amended Complaint by January 27, 2006.

IT IS SO ORDERED.

## APPENDIX A

### *LEGAL NOTICE*

THIS NOTICE MAY AFFECT YOUR RIGHTS. PLEASE READ CAREFULLY.

**TO:** Lineal Descendants of Persons Listed on the 1886 Census of Mdewakanton Sioux Indians Residing in Minnesota, as supplemented by a census conducted in 1889.

### I. BACKGROUND OF THE CASE

The plaintiffs in this case seek compensation from the United States Government as a result of the United States' alleged breach of a trust that was created for the benefit of Indians in Minnesota who were members of the Mdewakanton and Wahpakoota bands of Sioux Indians prior to the 1862 Outbreak, who remained loyal to the United States during that Outbreak, and who severed their tribal relations as a result ("loyal Mdewakanton"). This legal notice is being provided by the plaintiffs in this case because your legal

---

**33.** This result comports with the language of 41 U.S.C. § 114(b), which limits the factual circumstances in which the government may make a third-party claim:

[T]he United States shall not be heard upon any counterclaims, claims for damages or other demands whatsoever against such person, other than claims and contingent claims for the recovery of money hereafter paid by the United States in respect of the transaction or matter which constitutes the subject matter of such case, unless and until such person shall assert therein a claim, or an interest in a claim, against the United States.

rights may be affected by the outcome of the case.

Through legislative enactments in 1888, 1889, and 1890, Congress appropriated funds to be used by the United States Department of Interior to benefit the loyal Mdewakanton. The United States Government used a census taken in 1886 to determine which individuals were eligible for benefits. Congress specified that the funds were to be applied for the benefit of members of the loyal Mdewakanton "of full or mixed blood" and their families. A substantial portion of the funds were used to purchase tracts of lands in Minnesota and improvements on that land, as well livestock and implements. The United States Department of Interior managed these tracts of lands on behalf of the loyal Mdewakanton, and members of the loyal Mdewakanton and their families and descendants were eligible to receive assignments of land for their use. The court has concluded that a trust was created in connection with, and as a consequence of, the 1888, 1889, and 1890 Appropriation Acts for the benefit of the loyal Mdewakanton (a trust is a special legal relationship in which one party holds property for the benefit of another party).

In December 1980, a statute was enacted that converted the interests of the United States in the trust property to a holding also by the United States but in trust for three federally-recognized Native American communities (the Shakopee, Prairie Island, and Lower Sioux Indian communities). The court has determined that the United States breached its trust obligations to the loyal Mdewakanton and their descendants through actions taken upon enactment of the 1980 Act.

The court has not entered a final judgment in this case and has made no determination as to whether any damages will be awarded in this case. The defendant, the United States Government, has denied that the plaintiffs are entitled to any relief.

## II. NOTICE OF YOUR RIGHTS

The court has ordered that "the best notice practicable in the circumstances" be given to all those who may have an interest in the trust properties in this case, such that they might act to protect their rights. If you meet the description of a lineal descendant of the loyal Mdewakanton, and you can provide documentation of such lineage (see III., below), you are eligible to join this lawsuit as a plaintiff.

If you choose to join this lawsuit as a plaintiff, the law firm of Mohrman and Kaardal, P.A., is available to act on your behalf and for all other plaintiffs in presenting the case against the United States. If you desire, you may appear and participate in the case through your own attorney, and, if you decide to obtain separate representation, your attorney should file an appearance in the case, along with an appropriate pleading on your behalf. In all events, you may advise the court at any time if you believe you are not being fairly and adequately represented by counsel. Any recovery obtained by you from the United States will depend upon the results of this lawsuit. If no recovery is obtained, you will be bound by that result. You will be subject to subsequent orders and required notices in this action. In the event of a proposed settlement or voluntary dismissal of claims, you will be entitled to notice of and an opportunity to be heard respecting these issues.

If you choose not to participate as a plaintiff in this lawsuit, any future claim brought by you may be barred by your delay. Furthermore, the court's findings of fact and conclusions of law in this case may be binding on any later claim brought by you.

To participate as a plaintiff, you should either respond to Mohrman & Kaardal, P.A. by April 20, 2006, or retain your own counsel, such that a filing can be made with the court on your behalf by April 28, 2006. No plaintiffs will be added after April 28, 2006 absent a showing of good cause.

## III. DETERMINING WHETHER YOU ARE A LINEAL DESCENDANT

To participate in this lawsuit, you must have a blood-related ancestor who did receive or was eligible to receive benefits of the trust. If an ancestor (for example, parent, grandparent, great-grandparent) appeared

on the census of 1886, there is a presumption that the individual was eligible to receive benefits under the trust. Copies of the 1886 census and of the 1889 supplemental census are available from the law firm of Mohrman & Kaardal, P.A.

To show you are a lineal descendant of an individual who was eligible to receive benefits of the trust property, you should have documentation showing that you are a lineal descendant. Birth certificates or other birth records (such as hospital records, baptismal certificates, or family Bibles) should be provided for each generation, tracing your ancestry back to an individual who was an eligible beneficiary under the trust.

## IV. ELECTION BY POTENTIAL PLAINTIFFS

If you wish to be included in this lawsuit, you may return the attached form ("Request to Join as Plaintiff"), on or before April 20, 2006, to:

Mohrman & Kaardal, P.A.

33 South Sixth St., Suite 4100

Minneapolis, MN 55402

If you return the Request to Join as Plaintiff, you may be liable for your pro rata share of the costs and expenses of the litigation.

You may instead have an attorney of your choice represent you in this case. An individual choosing to be represented through his or her own counsel is reminded that he or she will be responsible himself or herself for the fees, costs, and disbursements resulting therefrom. Again, those who wish to join the lawsuit separately from the group that has retained Mohrman & Kaardal, P.A. should retain counsel who can make the necessary filing with the court no later than April 28, 2006.

## V. FURTHER PROCEEDINGS

A trial on the merits of plaintiffs' claims and possible damages will be held on a date to be determined in the future.

## VI. ADDITIONAL INFORMATION

Any questions you have concerning the matters contained in this Notice (and any corrections or changes of name or address) should not be addressed to the United States Government or to the court, but rather should be directed to Mohrman & Kaardal, P.A.:

Mail: 33 South Sixth St., Suite 4100
Minneapolis, MN 55402
Email: support@mklaw.com
Telephone: 1–866–629–1886
Facsimile: 1–612–341–1076

## VII. REMINDER AS TO TIME LIMIT

If you wish to be included as a plaintiff on whose behalf this action is being maintained, you should act promptly, either returning the completed "Request to Join as Plaintiff" form to Mohrman & Kaardal, P.A. by mail postmarked no later than April 20, 2006, or retaining your own attorney and filing through that attorney a pleading with the court by April 28, 2006.

THIS NOTICE WAS SENT TO YOU BY THE LAW FIRM OF MOHRMAN & KAARDAL, P.A., AND WAS AUTHORIZED BY ORDER OF THE COURT DATED DECEMBER 16, 2005. THE SENDING OF THE NOTICE DOES NOT IMPLY THAT THE COURT HAS RULED THAT THE GOVERNMENT IS LIABLE OR THAT THE RECIPIENT OF THIS NOTICE WILL BE ENTITLED TO RECEIVE ANY AMOUNT OF DAMAGES.

### *REQUEST TO JOIN AS PLAINTIFF*

I elect to be included as a plaintiff in this lawsuit in Case Number 03–2684L currently pending in the United States Court of Federal Claims. By executing this Request, I understand that:

___ The law firm of Mohrman & Kaardal, P.A., will act on my behalf and for all other plaintiffs in presenting the case against the United States, and I may be liable for my pro rata share of the costs and expenses of the litigation; or

___ I plan to appear and participate in the case through my own attorney.

In either case, I may advise the court at any time if I believe I am not being fairly and adequately represented by counsel. I understand that any recovery obtained by me from the United States will depend upon the results of this lawsuit, and if no recovery is obtained, I will be bound by that result, and that I will be subject to subsequent orders and required notices in this action.

SIGNATURE: _____    DATE: _____

PRINT NAME: _____

         First Name        Middle Initial        Last Name

ADDRESS: _____

_____

TELEPHONE: _____

Return this form to:
      Mohrman & Kaardal, P.A.
      33 South Sixth St., Suite 4100
      Minneapolis, MN 55402

## ADDENDUM TO APPENDIX A

### *INSTRUCTIONS TO COUNSEL REGARDING NOTICE*

In the Opinion and Order of December 16, 2005, the court authorizes plaintiffs' counsel in this case to provide "the best notice practicable in the circumstances" to all lineal descendants of the loyal Mdewakanton. In providing such notice, plaintiffs' counsel are directed to observe these instructions.

#### A. Notice to Individuals Whose Names and Addresses are Known

Where a specific identification of lineal descendants has been made, plaintiffs' counsel should provide personal notice to the individual, as follows:

Plaintiffs' counsel shall issue an original and a copy of the "Legal Notice" form provided in this Appendix to each person to be notified. The Notice shall be accompanied by a copy of the pleadings. Plaintiffs' counsel shall cause the same to be served on the person by registered or certified mail, return receipt requested. Thereafter, plaintiffs' counsel shall file with the clerk a return of such service, which return shall include the copy of the notice with return receipt attached.

Such service shall be accomplished at plaintiffs' cost.

#### B. Notice by Publication

With respect to those persons who cannot be specifically identified or located, plaintiffs' counsel are directed to cause notice to be published in publications which are most likely to be seen and read by lineal descendants. Publication shall take the general form of, and shall include the information in, the "Legal Notice" form provided as part of this Appendix.

The publications in which the notice shall be printed are:

- *The Circle–Native American News and Arts* (Minnesota)—published since 1980 (monthly); circulation 15,000.
- *Native American Press/Ojibwe News* (Minnesota)—published since 1980 (weekly); circulation 8,000.

- *Lakota Journal* (Rapid City, South Dakota)—published since 2000 (weekly); circulation 10,000.
- *Indian Country Today* (National)—published since 1981 (weekly); circulation 12,000.

Plaintiffs' counsel may cause notice to be published in additional publications with similar coverage.

Plaintiffs' counsel also are directed to cause notice to be published in at least one newspaper of general circulation in the Minneapolis–St. Paul area, one newspaper of general circulation in the southwestern area of Minnesota, and one newspaper of general circulation that is published in south-central Minnesota. Publication of notice shall occur in these newspapers at least once in each of three successive weeks, if such newspapers are published on a daily or weekly basis. Plaintiffs' counsel shall either provide a copy of the notices as published or shall procure an affidavit of the publisher of each publication showing that publication of the notice has been made. For each publication, plaintiffs' counsel shall file with the clerk of court such copies or affidavits as proof that publication has been made.

Such publication shall be accomplished at plaintiffs' cost.

### C. Web–Site Posting

Plaintiffs' counsel shall not post the notice on their own web-site, nor may the notice be published on any web-site that is or may be attributable to plaintiffs or to any substantial group of them.

The motion may be posted on a web-site hosted by the communities, or any one or more of them, so long as the notice is published without commentary. A short, neutral introduction explaining the origin of the notice may be provided.

