**Sheldon Peters WOLFCHILD, et al., Plaintiffs,**

v.

**UNITED STATES, Defendant.**

Nos. 03–2684L, 01–568L.

United States Court of Federal Claims.

Sept. 26, 2007.

Erick G. Kaardal, Mohrman & Kaardal, PA, Minneapolis, MN, for Wolfchild plaintiffs. With him on the briefs were William F. Mohrman, Mohrman & Kaardal, P.A., Minneapolis, MN, and Douglas R. Kettering, Yankton, SD.

Lawrence H. Crosby, Crosby & Associates, St. Paul, MN, for Cermak plaintiffs.

Laura Maroldy, Trial Attorney, Natural Resources Section, Environment and Natural Resources Division, United States Department of Justice, Washington, D.C., for defendant. With her on the briefs were Ronald J. Tenpas, Acting Assistant Attorney General, and Thomas Zia and Sara Culley, Trial Attorneys, Environment and Natural Resources Division, United States Department

of Justice, Washington, D.C. Of counsel were Janet Goodwin and James Porter, Office of the Solicitor, Department of the Interior, Washington, D.C.

Eric J. Magnuson, Rider Bennett, LLP, Minneapolis, MN, for intervening plaintiff Lower Sioux Indian Community.

Jack E. Pierce, Pierce Law Firm, PA, Minneapolis, MN, for the Stephens, R. Cermak, J. Cermak, Henderson, Klingberg, Alkire, Arnold, and Godoy groups of intervening plaintiffs.

Kelly H. Stricherz, Vermillion, SD, for the Mozak group of intervening plaintiffs.

Garrett J. Horn, Horn Law Office, Yankton, SD, for the Saul, Trudell, Taylor, Ferris, Henry, and Vassar groups of intervening plaintiffs.

Creighton A. Thurman, Yankton, SD, for the Cournoyer, Robinette, Kimbell, French, and Wanna groups of intervening plaintiffs.

Elizabeth T. Walker, Walker Associates, Alexandria, VA, for the anonymous Walker group of intervening plaintiffs.

Robin L. Zephier, Abourezk & Zephier, PC, Rapid City, SD, for the Zephier group of intervening plaintiffs.

Larry Leventhal, St. Paul, MN, for the Burley group of intervening plaintiffs.

Wood R. Foster, Jr., Siegel, Brill, Greupner, Duffy & Foster, PA, Minneapolis, MN, for the Lafferty, Blaeser, Whipple, and Lowe groups of intervening plaintiffs.

Sam S. Killinger, Rawlings, Nieland, Probasco, Killinger, Ellwanger, Jacobs & Mohrhauser, LLP, Sioux City, IA, for the Enyard and Kitto groups of intervening plaintiffs.

Bernard J. Rooney, Amherst, WI, for the Rooney group of intervening plaintiffs.

Scott A. Johnson, Johnson Law Group, Minnetonka, MN, for the Rocque group of intervening plaintiffs.

James L. Blair, Renaud, Cook, Drury, Mesaros, PA, Phoenix, AZ, for the anonymous Blair group of intervening plaintiffs. With

him on the briefs was Barry P. Hogan, Renaud Cook Drury Mesaros, PA, Phoenix, AZ.

Gary J. Montana, Montana & Associates, Osseo, WI, for the Julia DuMarce group of intervening plaintiffs.

Nicole N. Emerson, Lynn, Jackson, Shultz & Lebrun, PC, Sioux Falls, SD, for the Garreau group of intervening plaintiffs.

Douglas Kettering, Kettering Law Office, Yankton, SD, for the Ke Zephier group of intervening plaintiffs.

Randy V. Thompson, Nolan, MacGregor, Thompson & Leighton, St. Paul, MN, for the Abrahamson group of intervening plaintiffs.

Frances Felix, pro se, Minneapolis, MN, for herself and members of her immediate family as intervening plaintiffs.

Royce Deryl Edwards, Jr., Joplin, MO, for the Vadnais group of intervening plaintiffs.

Philip W. Morgan, Britton, SD, for the Youngbear and Marvel DuMarce groups of intervening plaintiffs and for the Werner group of applicants for intervention.

Brian L. Radke, Radke Law Office, P.C., Sioux Falls, SD for the Schroder group of intervening plaintiffs.

## OPINION AND ORDER

LETTOW, Judge.

This Indian trust case has been brought by approximately 20,750 individuals claiming descent from persons who were members of the Mdewakanton band of Sioux Indians and who assisted white settlers in Minnesota during the 1862 Sioux uprising ("the loyal Mdewakanton"). *See Wolfchild v. United States*, 62 Fed.Cl. 521, 526–29 (2004) ("*Wolfchild I*") (describing the 1862 Sioux uprising, the role of the loyal Mdewakanton, and their severance of tribal relations after the uprising).[1] Promptly after this suit was filed in November 2003, the court addressed the nature and viability of the Indian trust claims, in due course granting a motion by plaintiffs for a partial summary judgment that (1) a trust, which included land, improvements to land,

---

1. The lineal descendants of the loyal Mdewakanton constitute an "identifiable group of American Indians" within the meaning of the Indian Tucker Act, 28 U.S.C. § 1505, and accordingly this is a collective action under that Act.

and monies as the corpus, was created in connection with, and as a result of, provisions in appropriation acts for the Department of the Interior in 1888, 1889, and 1890 ("Appropriation Acts")[2] that provided money to be expended under specific directions for the benefit of the loyal Mdewakanton and their descendants,[3] (2) such trust was neither extinguished nor terminated by the Act of December 19, 1980, Pub.L. No. 96–557, 94 Stat. 3262 (the "1980 Act"), which converted interests of the United States in the property at issue to a holding in trust for three Indian communities located in Minnesota,[4] and (3) the United States breached the trust engendered by the Appropriation Acts through the passage of the 1980 Act and other actions taken thereafter. *See Wolfchild I*, 62 Fed.Cl. at 555.[5]

Thereafter, over a period of two and one-half years, the court considered and resolved numerous party-related issues that arose in this collective action. *See Wolfchild v. United States*, 68 Fed.Cl. 779 (2005) ("*Wolfchild II*"); *Wolfchild v. United States*, 72 Fed.Cl. 511 (2006) ("*Wolfchild III*"); *Wolfchild v. United States*, 77 Fed.Cl. 22 (2007) ("*Wolfchild IV*"). Among other things, the court granted plaintiffs' request for authorization to inform prospective plaintiffs of the pendency of this action, *Wolfchild II*, 68 Fed.Cl. at 785–87, 801, requiring plaintiffs to send personal notice to all lineal descendants of the loyal Mdewakanton whose names and

---

**2.** The three Appropriation Acts are the Act of June 29, 1888, ch. 503, 25 Stat. 217, 228–29; the Act of Mar. 2, 1889, ch. 412, 25 Stat. 980, 992–93; and the Act of Aug. 19, 1890, ch. 807, 26 Stat. 336, 349.

**3.** The initial trust beneficiaries were defined in the Appropriation Acts as "Indians in Minnesota, belonging to the Medwakanton [sic] band of Sioux Indians, who have resided in said State since [May 20, 1886] ... and severed their tribal relations." Act of June 29, 1888, 25 Stat. at 228; *accord* Act of Mar. 2, 1889, 25 Stat. at 992; Act of Aug. 19, 1890, 26 Stat. at 349. These Indians had been loyal to the United States during the Sioux uprising, which began in Minnesota in August 1862 and claimed the lives of more than 500 white settlers and numerous Indians. *See Wolfchild I*, 62 Fed.Cl. at 526. By aiding the white settlers, many of the loyal Indians lost their homes and property, and Congress concluded that their lives would be in danger were they to return to their tribes. *Id.* (quoting *Cong. Globe*, 38th Cong., 1st Sess. 3516 (1864)).

The explicit statutory definitional reference to Indians "who have resided in said State since ... [May 20, 1886]" was to a census prepared by U.S. Special Agent Walter McLeod, who determined on behalf of the Commissioner of Indian Affairs which Mdewakanton Indians (1) were loyal to the United States during the 1862 uprising, (2) had renounced their tribal relations, and (3) had remained in Minnesota. *See Wolfchild I*, 62 Fed.Cl. at 528.

Under the 1889 and 1890 Appropriations Acts, the beneficiaries included both the loyal Mdewakanton and their families. Act of Mar. 2, 1889, 25 Stat. at 992 (monies to be appropriated for "these Indians or family thereof"); Act of Aug. 19, 1890, 26 Stat. at 349 (monies to be appropriated for "these Indians or families thereof"). The Appropriation Acts were intended as a substantial addendum to an act adopted in 1863 for the benefit of "individual[s] of the before-named bands [Sisseton, Wahpaton, Mdewakanton, and Wahpakoota] who exerted [them]sel[ves] in rescuing the whites from the late massacre [by] said Indians." Act of Feb. 16, 1863, § 9, 12 Stat. 652, 654. *See Wolfchild I*, 62 Fed.Cl. at 526. The 1863 Act specified that the land addressed by that Act "shall be an inheritance to said Indians and their heirs forever." 12 Stat. at 654. This prior statutory text illuminates the reference to "families" in the later Appropriation Acts.

**4.** The three Indian communities are the Lower Sioux Indian Community, the Shakopee Mdewakanton Sioux (Dakota) Community, and the Prairie Island Indian Community in Minnesota. Pub.L. No. 96–557, 94 Stat. at 3262.

**5.** Plaintiffs also put forward contractual claims that were dismissed because of the six-year statute of limitations applicable to claims brought under the Tucker Act, but their trust claims had been preserved by the Indian Trust Accounting Statute. *Wolfchild I*, 62 Fed.Cl. at 547–49; *see* Department of the Interior and Related Agencies Appropriations Act, 2004, Pub.L. No. 108–108, 117 Stat. 1241, 1263 (2003). The Indian Trust Accounting Statute, with minor variations, has been enacted for fiscal years 1991 to 2006 as part of the annual appropriations statute for the Department of the Interior. It provides that the statute of limitations for claims alleging mismanagement or loss of Indian trust funds shall not begin to run until the beneficiaries have been given an accounting. *See* Pub.L. No. 108–108, 117 Stat. at 1263 (fiscal year 2004 version); *accord* Department of the Interior, Environment, and Related Agencies Appropriation Act, 2006, Pub.L. No. 109–54, 119 Stat. 499, 519 (2005) (fiscal year 2006 version); *see also Shoshone Indian Tribe of Wind River Reservation v. United States*, 364 F.3d 1339, 1347 (Fed.Cir.2004); *Wolfchild I*, 62 Fed.Cl. at 534–535 & n. 10.

addresses were known and who had not already joined in the action, and to publish notice in newspapers and periodicals that had wide circulation in Minnesota or among Native Americans. *Id.* at 801, 804–805; *Wolfchild III*, 72 Fed.Cl. at 516.[6] Subsequently, plaintiffs were granted leave to file a Third Amended Complaint to add thousands of additional plaintiffs, and thousands of other individuals, making up 41 separate groups, were granted intervention as plaintiffs. *Wolfchild III*, 72 Fed.Cl. at 514, 539–40; *Wolfchild IV*, 77 Fed.Cl. at 31–36. The court also granted a motion by the Lower Sioux Indian Community ("Lower Sioux") for leave to intervene as a plaintiff. *Wolfchild III*, 72 Fed.Cl. at 514, 540. Third-party summonses were issued to the Prairie Island and Shakopee Indian Communities to bring those Communities into the case as defendants, but those summonses were quashed because the redressability criterion for standing under Article III of the Constitution was not satisfied as to those communities. *Wolfchild IV*, 77 Fed.Cl. at 27–31.

At this juncture, both the court and most of the parties are ready to proceed with discovery and other steps to prepare the case for resolution.[7] The parties have proposed several variants of a plan and schedule for these steps. However, the government has interposed a motion to certify the court's prior decisions, specifically those rendered in October 2004 (*Wolfchild I*), December 2005 (*Wolfchild II*), and August 2006 (*Wolfchild III*), for interlocutory appeal under 28 U.S.C. § 1292(d)(2), and to stay discovery and other preparatory proceedings in the interim. All of the plaintiffs and intervening plaintiffs oppose this motion on procedural (*i.e.,* untimeli-

ness) and substantive grounds. By this decision, the court addresses each of the parties' pending motions and requests.

## ANALYSIS

### A. Pre–Trial Plan and Schedule

Looking forward to efforts by the parties to prepare this case for resolution on the merits, in *Wolfchild IV* the court asked counsel to undertake three steps: (1) that counsel for the various groups of intervening plaintiffs select a proposed coordinating counsel and an alternate for each of the two different categories of individual intervening plaintiffs, namely, those who claim descendancy from persons on the 1886 and 1889 censuses prepared by special agents of the Department of the Interior and those whose claim has another source, (2) that counsel for the parties confer and submit a plan and schedule for pre-trial proceedings, and (3) that counsel for plaintiffs and for each group of intervening plaintiffs submit compact disks listing the individual claimants represented by them, including, separately to the court and counsel for defendant only, lists of those claimants who have been granted leave to participate anonymously in this litigation. 77 Fed.Cl. at 36. Those steps have been accomplished.

The court acknowledges and accepts the selection by counsel for intervening plaintiffs of Sam Killinger as coordinating counsel for Group A, the intervening plaintiffs who claim descendancy from the 1886 and 1889 censuses, with Garrett Horn as the alternate and Kelly Stricherz as assistant for Group A, and Gary Montana as coordinating counsel for Group B, those intervening plaintiffs who base their claim on other sources, with

---

**6.** To aid in providing notice to potentially interested persons, and pursuant to the "Call Statute," 28 U.S.C. § 2507, the court also required the government to provide a listing of those lineal descendants known to the government. *Wolfchild II*, 68 Fed.Cl. at 797–98.

**7.** In *Wolfchild IV*, the court identified the following issues as requiring development prior to resolution of the case:
   (1) delineating the trust created by the 1888, 1889, and 1890 Appropriation Acts, (2) accounting for the [handling of the] trust corpus by the Department of the Interior and its agents after enactment of the 1980 Act, (3)

addressing the current legal status of the 1886 lands, (4) explicating and applying the criteria for determining whether a plaintiff or intervening plaintiff qualifies as a lineal descendant of a loyal Mdewakanton and thus a beneficiary of the trust, and (5) determining the monetary relief to which individual claimants might be entitled.

77 Fed.Cl. at 36. Notwithstanding this recitation of issues, the litigation now might be distilled down to three fundamental questions: "what property is involved," "what's happened to that property," and "who's a lineal descendant." Hr'g Tr. 76:25 to 77:3 (Aug. 6, 2007).

Creighton Thurman as the alternate and Robin Zephier as assistant. These counsel have accepted responsibility for drawing together the positions of the groups of intervening plaintiffs on the issues that may arise and for presenting the positions of their groups to the court in a single filing, if feasible. Hr'g Tr. 29:7 to 31:8, 34:11–24 (Aug. 6, 2007).[8]

The plan and schedule proposed by plaintiffs and intervening plaintiffs has six basic elements: (1) initial disclosures under Rule 26(a) of the Rules of the Court of Federal Claims ("RCFC"), (2) discovery particularly to identify trust assets and the handling of those assets, to include U.S. Treasury accounts 147436 and 147936 for the Bureau of Indian Affairs, as well as the 1886 lands, (3) discovery regarding revenues or income produced or generated by or from the 1886 lands by the Communities, and from monies transferred to the Communities by the Department of the Interior, and payments and distributions made by the Communities of such revenues or income, (4) a bar on the deposition of any individual plaintiff or intervening plaintiff, absent court approval, (5) a schedule for submission and briefing of summary judgment motions, and (6) a time for commencement of trial. Joint Status Report (July 20, 2007) ("JSR") at 3–4, 31–47, 48–64 and following sheet. Defendant "objects to proceeding with initial disclosures at this stage," or taking any of the other further preparatory elements identified by plaintiffs and intervening plaintiffs, pending final action on its motion for certification for interlocutory appeal. JSR at 28.

The government concedes that fundamental issues remain unresolved and, indeed, significantly unexplored. Among other things, "[d]efendant notes particularly that the question of the scope of the alleged trust, including what types of assets lie within that 'trust,' has yet to be determined in this litigation." JSR at 29. Notably, the court's initial

obligations in these cases were to determine whether plaintiffs had stated a viable claim over which the court had jurisdiction, *see* *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 88–89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998), and then to oversee joinder of additional parties in an orderly manner in this collective action. *See Hoffmann–La Roche, Inc. v. Sperling,* 493 U.S. 165, 170–71, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989). The court has fulfilled those responsibilities, and in the process has granted partial summary judgment to plaintiffs and added thousands of plaintiffs and intervening plaintiffs to the litigation. Now, when the time for fleshing out the fundamental issues is at hand, it would be notably unfair and prejudicial to the plaintiffs to halt preparatory steps to that end. Accordingly, acting pursuant to RCFC 16(b) and RCFC Appendix A, ¶¶ 7–8, the court adopts a modified schedule for further proceedings, as set out at the conclusion of this opinion.

**B. Residual Party–Related Issues**

Although *Wolfchild III* and *Wolfchild IV* addressed questions about participation of numerous individuals and the Communities in this litigation, the parties have raised residual party-related issues. Managing this collective action with a very large number of individual claimants separated into so many groups has proved to be a daunting task. *See Wolfchild IV,* 77 Fed.Cl. at 34 ("This action threatens to become so cumbersome and laden with claimants that bringing it to a final conclusion within a reasonable time is put in jeopardy."). In April 2007, after first imposing a twice-extended deadline for claimants to intervene as plaintiffs, and then allowing yet a further set of motions to intervene and to amend previously granted interventions, the court warned that "any future requests by individuals to participate in the *Wolfchild* case as claimants will be deemed to be untimely and to impair the manageability of this suit." *Id.* at 35–36.[9] Noting that

---

**8.** Most of the lineal descendants who have appeared and submitted a claim as plaintiff or intervening plaintiff live in Minnesota, Nebraska, South Dakota, Iowa, and Montana, Hr'g Tr. 45:22–23, and counsel generally are located in the upper Midwest and Plains States.

All citations to the "Hr'g Tr." in this decision are to the transcript of the hearing held on August 6, 2007.

**9.** The court acted in accord with its authority in a collective action to "limit [ ] time for … the joinder of additional parties." *Hoffmann–La Roche,* 493 U.S. at 173, 110 S.Ct. 482.

the statute of limitations had not yet begun to run because of the Indian Trust Accounting Statute, the court advised that "[f]urther individuals who wish to pursue claims of breach of trust arising out of the 1888, 1889, and 1890 Appropriations Acts must file separate actions to vindicate their positions." *Id.* at 36. Now, at this later stage of the case the court has been presented with numerous requests to correct names, including those of newly married persons as well as others, and to add children newborn to persons already named as plaintiffs or intervening plaintiffs. Twenty-one such motions are pending, filed by plaintiffs and by twenty groups of intervening plaintiffs. At a hearing held on August 6, 2007, the court required that any such motion be filed on or before August 20, 2007. Each of the pending motions was filed by that date.

The government has not objected to these motions insofar as they seek to correct names or to add newborn children, *see* Def.'s Resp. to Garreau (Hall) Mot. for Leave to File Am. Compl. to Correct Names [582] at 1; Def.'s Omnibus Mem. of Points and Authorities [596] ("Def.'s Omnibus Mem.") at 2–3, but it has objected to adding other additional plaintiffs. Def.'s Omnibus Mem. at 4–5. For purposes of amending the complaint and intervening complaints in this litigation, the government would define "newborns" as those persons born between July 12, 2006 and August 20, 2007. *Id.* at 2. The government recites that the common definition of "newborn" is a "neonate" or a "newborn infant, especially less than four weeks old." *Id.* at 3 (quoting *The American Heritage Dictionary of the English Language* 1178 (4th ed.2000)).[10] Here, however, the government puts forward a more expansive definition of newborn to account for the fact that the court previously set July 12, 2006, as the extended deadline for intervention. *Id.* at 2.

The court conceptually accepts the government's suggested expansive definition of newborn for purposes of the pending motions. However, the government's proposed delineating dates for the newborns have to be modified. It would be unrealistic to expect that child born shortly before the prior deadline for intervention could reasonably have been included in a complaint for intervention. Accordingly, the court will consider newborns for this specific purpose to be persons born between January 1, 2006 and August 20, 2007.

Four groups proposed to include newborn children who are *en ventre sa mere*. *See* the motions to amend filed by the Whipple group [538], Lafferty group [539], Lowe group [540], and Mozak group [547]. The government acknowledges that the court previously allowed unborn children to be included in a complaint in intervention, at least conditionally. Def.'s Omnibus Mem. at 3–4 (referring to *Wolfchild IV*, 77 Fed.Cl. at 35 n. 22). The court's prior action was based upon the common law rule that a child *en ventre sa mere* is deemed to be *in esse* for purposes of inheritance or taking a remainder or other estate of interest for its own benefit. *Wolfchild IV*, 77 Fed.Cl. at 35 n. 22. The government does not challenge the common law rule, but it does resist the conclusion that an unborn child possesses a cause of action cognizable in federal court for damages. Def.'s Omnibus Mem. at 4. Nonetheless, the government does not oppose the addition of those putative plaintiffs in this litigation, so long as they are properly identified. *Id.* The court consequently allows unborn children to be added to the listing of individual plaintiffs for the four groups of intervenors which sought to include them.

Plaintiffs and four groups have sought to amend their complaints to add persons who were not newborns.[11] The groups do not

---

10. The definition actually quoted by defendant is that for "neonate," not "newborn." *Compare The American Heritage Dictionary of the English Language* 1178 ("[N]eonate" means "[a] newborn infant, especially one less than four weeks old."), *with id.* at 1184 ("[N]ewborn" means "[v]ery recently born.") "Neonate" thus implies that a baby has been born within a more specifically defined recent time than "newborn." For

purposes of this case, the difference is not significant.

11. Plaintiffs [567], and the Vadnais [558], Julia DuMarce [545], Rocque [524], and Marvel DuMarce [560] groups of intervening plaintiffs have sought to add a person or persons not previously named in any prior complaint or complaint in intervention.

offer an explanation or justification for these additions, other than the representation that the new claimants were "inadvertently not included" earlier, Aff. Re Am. Compl. [562], and that no prejudice to any party would result from the addition. Intervenors' Reply [617] at 2. *See also* Pl.'s and Intervenors Supplement to Joint Status Report and Response.... Addressing the United States' Opposition to Amend Complaints [623] at 5 (contending that no prejudice would arise from adding claimants at this stage of the case, and requesting that the court "permit an additional filing period of three additional weeks for amended complaints adding additional [p]laintiffs and [i]ntervenors."). Also, in the same vein, one new group, the Werner group, has sought leave to intervene.[12] In support of the Werner group's motion, the applicants for intervention aver that they are descendants of persons listed on the 1886 census of loyal Mdewakanton prepared by Special Agent Walter McLeod for the Department of the Interior. Applicant's Mem. [550] at 1. They explain that the timing of their application was governed by their need to produce "genealogical information to establish their connection as rightful lineal descendants." *Id.* at 2. The government opposes these additions, noting that the court in *Wolfchild IV* had specified that further requests by individuals to participate as claimants would be deemed to be untimely. Def.'s Omnibus Mem. at 4–5 (drawing upon *Wolfchild IV*, 77 Fed.Cl. at 35–36); Def.'s Resp. In Opposition to Werner Group's Mem. [601] at 2.

▮▮▮ The court concurs with the government's opposition to these efforts to add plaintiffs other than newborns, notwithstanding the fact that under RCFC 15(a) amendments are generally favored. As the rule specifies, "leave [to amend a pleading] shall be freely given when justice so requires." RCFC 15(a); *see also Foman v. Davis.* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). However, a motion to amend may be denied because of, among other things, un-

due delay or prejudice to existing parties. *Foman*, 371 U.S. at 182, 83 S.Ct. 227; *Te-Moak Bands of W. Shoshone Indians of Nev. v. United States*, 948 F.2d 1258, 1260 (Fed. Cir.1991); *Christofferson v. United States*, 77 Fed.Cl. 361, 363–66 (2007); *Rockwell Automation, Inc. v. United States*, 70 Fed.Cl. 114, 121–23 (2006).[13] Here, the proposed additions come too late. As the court has observed, this action has already become extraordinarily "cumbersome and laden with claimants." *Wolfchild IV*, 77 Fed.Cl. at 34. A belated addition of other claimants would exacerbate the problems in managing the litigation and imperil the "just, speedy, and inexpensive determination" of the pending claims and defenses. RCFC 1. Particularly because the applicants who are not being allowed to join their claims in this litigation may file separate actions for relief without facing any bar from a statute of limitations, *see Wolfchild IV*, 77 Fed.Cl. at 36, the proposed addition of new intervening plaintiffs other than newborns will not be allowed.

Separately, the intervention of members of the Felix family poses a discrete pair of questions. First, those persons who are members of the extended but not immediate family of Francis Elaine Felix have moved for leave to be added to the Rocque group of intervening plaintiffs [524]. The extended Felix family had previously sought intervention in June 2006, and the court "allowed Ms. Felix to represent her family" only for purposes of the intervention motion. *Wolfchild II*, 72 Fed.Cl. at 519 n. 9. The intervention motion was granted. *Id.* at 539. However, at that time the court noted that under RCFC 83.1(c)(8), Ms. Felix could represent herself and her "immediate" family on a *pro se* basis but could not represent the members of her extended family. *Id.* at 519 n. 9. As a result, the court required the members of her extended family to appear by counsel. *Id.* They did not do so in a timely fashion.

When the extended Felix family finally did act to protect their claims, they sought to "clarify" that they were and remained inter-

---

**12.** The Werner group's motion to intervene [550] would add a further set of intervening plaintiffs comprised of fourteen adults and seven minor children.

**13.** A motion for intervention under RCFC 24 must also be predicated upon a "timely application." RCFC 24(a), (b).

vening plaintiffs even though they were not represented by counsel and had not filed a separate complaint in intervention. *See* Mot. to Clarify [506]. The government resisted that motion but advised that it would not oppose the addition of specifically identified members of the extended Felix family to an existing group of intervening plaintiffs, so long as no new answers were required. *See* Def.'s Resp. to Mot. to Clarify [513] at 2–3. Those conditions have been satisfied. Accordingly, the court grants the motion to amend the complaint in intervention of the Rocque group, to add individually identified members of the extended Felix family.

Second, the government objects to inclusion of Ms. Felix's grandchildren in her "immediate" family group, represented by her on a *pro se* basis. *See* Def.'s Resp. to Mot. to Clarify [513] at 3 n. 2; Hr'g Tr. 14:3–25. The government has done so on the basis that the term "immediate family" as used in RCFC 83.1(c)(8), allowing representation on a *pro se* basis, encompasses a nuclear family of parents and children but not grandchildren. The government points to a prior decision to that effect by a judge of this court, *Chief War Eagle Family Ass'n v. United States*, No. 07–213L (Fed.Cl. July 18, 2007) (refusing to allow a *pro se* litigant to represent his grandparents). In interpreting the rule, the court in *Chief War Eagle* relied upon a definition of "immediate family" set out in *Black's Law Dictionary*, providing that a family so limited consisted of "[a] person's parents, spouse, children and siblings." *See Chief War Eagle*, slip op. at 2 (citing *Black's Law Dictionary* 638 (8th ed.2004)). However, this court modestly and respectfully disagrees with, and will not follow, the interpretation accorded RCFC 83.1(c)(8) in *Chief War Eagle*. The cited definition itself refers to three generations of persons, not two. Moreover, with longevity increasing, societally there are more and more instances where, because of employment of both spouses or single parents, grandparents are directly involved in the care of children, or instances where parents are caring simultaneously for their children

and their parents. Thus, a three-generational span of direct familial interaction is again becoming typical. Accordingly, limiting "immediate" to two generations is unduly constraining. Ms. Felix may represent herself, her children, and her grandchildren.[14] The government has acquiesced in this result. Hr'g Tr. 14:13–18.

## C. Certification For Interlocutory Appeal

The government has moved for certification for interlocutory appeal of three questions:

(1) Whether a trust was created in connection with and as a consequence of the 1888, 1889, and 1890 Appropriations Acts for the benefit of the loyal Mdewakanton and their lineal descendants, which trust included land, improvements to land, and monies as the corpus;

(2) If the Appropriations Acts created such a trust, whether Congress terminated the trust with enactment of the 1980 Act; and

(3) Whether the Lower Sioux, Prairie Island and Shakopee Indian Communities act as the agents of the United States as a result of the 1980 Act.

Def.'s Mot. to Certify Orders for Interlocutory Appeal ("Def.'s Mot. to Certify") [510] at 4–5. As the government would have it, the requirements of 28 U.S.C. § 1292(d)(2) for certification are satisfied as to these three questions. *Id.* at 4–20.

Paragraph 1292(d)(2) of Title 28 provides in pertinent part that:

[w]hen any judge of the United States Court of Federal Claims, in issuing an interlocutory order, includes in the order a statement that a controlling question of law is involved with respect to which there is a substantial ground for difference of opinion and that an immediate appeal from that order may materially advance the ultimate termination of the litigation, the United States Court of Appeals for the Federal Circuit may, in its discretion, per-

---

**14.** Although Ms. Felix is appearing *pro se*, this litigation is proceeding as an "electronic case." Arrangements have been made for her to send and receive electronic filings through her brother, who is an attorney.

mit an appeal to be taken from such order, if application is made to that Court within ten days after the entry of such order. In slightly restated form, for a certification to be adopted, this statutory provision requires the court to determine that (1) a controlling question of law is at issue, (2) a substantial ground for differences of opinion exists regarding that question, and (3) certification may advance the ultimate termination of the litigation. The statute thus "establishes a three-part test for certification that 'is virtually identical to the statutory standard of certification utilized by the United States district courts [under 28 U.S.C. § 1292(b)].' " *Marriott Intern. Resorts, L.P. v. United States,* 63 Fed.Cl. 144, 145 (2004) (quoting *American Mgmt. Sys., Inc. v. United States,* 57 Fed.Cl. 275, 276 (2003) (some internal quotation marks omitted)). Conceptually, these statutory provisions "reserve interlocutory review for 'exceptional' cases while generally retaining for the federal courts a firm final judgment rule." *Caterpillar Inc. v. Lewis,* 519 U.S. 61, 74, 117 S.Ct. 467, 136 L.Ed.2d 437 (1996) (quoting *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 475, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978), in turn quoting *Fisons, Ltd. v. United States,* 458 F.2d 1241, 1248 (7th Cir.1972)).

Prior to applying the three-part statutory test, however, in this instance a threshold requirement for certification must be addressed. Any such request for certification must be timely. The governing statute sets no particular time limit on seeking certification of an interlocutory appeal. Nonetheless, the statute refers to an "immediate appeal," 28 U.S.C. § 1292(d)(2), and as Judge Posner explained in an opinion for the Court of Appeals for the Seventh Circuit in *Weir v. Propst,* 915 F.2d 283, 286 (7th Cir.1990), a timely motion for certification is required. Pointing to the circumstance that under Section 1292 a petition to the court of appeals has to be filed within ten days from the trial court's certification, Judge Posner commented that

> celerity was to be the touchstone of appealability under th[e] section. The reason is not hard to see. An interlocutory appeal normally interrupts the trial even though it

does not suspend the trial court's jurisdiction, and the parties ought to know at the earliest possible opportunity whether such an interruption is going to occur.

*Id.*

As a general matter, this court has denied motions to certify where the motion was made more than several months after the decision sought to be certified for interlocutory appeal was entered. *See Scholl v. United States,* 68 Fed.Cl. 58, 60 (2005) (collecting precedents). Under the prior decisions applying Section 1292(d)(2), certification by amending a prior order was allowed up to three months after the order was issued when good cause was shown for the delay. *Id.* (citing *Marriott Int'l,* 63 Fed.Cl. at 145). When the delays were longer, certification was denied. *Id.* These precedents are in agreement with the more broadly cast commentary in *Weir* that

> [t]he ten-day limitation in section 1292(b) is not to be nullified by promiscuous grants of motions to amend [prior interlocutory rulings]. An amendment that will have the effect of extending the limitation is proper only if there is a reason for the delay, as there would be for example if developments since the interlocutory order had been entered demonstrated, as had been unclear earlier, that the order resolved a controlling question of law about which there was substantial ground for a difference of opinion.

915 F.2d at 287.

In this instance, the government does not offer good cause for its delay of more than two and one-half years in moving for amendment of *Wolfchild I* to certify an appeal, and delays of nineteen and eleven months in moving to amend and certify *Wolfchild II* and *Wolfchild III.* In justification, the government indicates only that the court has largely completed "its rulings on ... party-related motions," Def.'s Mot. to Certify at 2, and that "[t]his litigation is at a point where interlocutory appeal is appropriate." *Id.* The party-related motions, however, have had only a tangential bearing on the two key questions the government asks the court to certify, *i.e.,* whether the Appropriation Acts and the Department of the Interior's subsequent imple-

mentation of those Acts created a trust and whether the 1980 Act terminated that trust. In short, the government's motion to amend the interlocutory orders issued in October 2004 (*Wolfchild I*), December 2005 (*Wolfchild II*), and August 2006 (*Wolfchild III*) to certify those orders for interlocutory appeal is untimely and must be denied.

In supplemental briefing, the government changes its approach and argues that the court could rectify the timeliness problems that arise with its motion to amend the earlier orders by entering a fresh order adopting the earlier orders and, in effect, certifying the new order for interlocutory appeal. Def.'s Supp. Br. in Support of Its Mot. to Certify at 2. Conceptually, this approach has some merit. *Weir*, for example, recognized that a subsequently issued order might provide an occasion to seek an appeal. *See* 915 F.2d at 286 ("If the deadline is missed, the order is not appealable. The defendant must then wait until another appealable order (normally, the final judgment) is entered, upon appeal of which he can challenge any interlocutory order that has not become moot."). *Compare Jenkins v. BellSouth Corp.*, 491 F.3d 1288, 1291–92 (11th Cir.2007) (rejecting under Fed.R.Civ.P. 23(f) a district court's effort to revive a class-certification decision for interlocutory appeal where the party seeking such appeal had failed to petition the court of appeals within ten days of the initial decision by the district court), *with Aparicio v. Swan Lake*, 643 F.2d 1109, 1112 (5th Cir.1981) (recognizing a district court's authority to vacate and reenter a certification order for purposes of 28 U.S.C. § 1292(b) where "the previous justification for a certification continues to exist"). Accordingly, the court will consider whether certification of *this* order might satisfy the criteria specified in Section 1292(d)(2).

The government argues that each of the three questions it seeks to raise on interlocutory appeal involves controlling questions of law. That proposition is arguably correct as to the first question posed, *i.e.*, whether the Appropriation Acts and the Department of Interior's implementation of them created a trust, is more confidently correct as to the second question, *i.e.*, whether the 1980 Act terminated the trust, and is assuredly *not* correct as to the third question respecting agency.

■ Taking the last question first, agency is ordinarily a mixed question of law and fact, *see Restatement (Third) Agency* § 1.02 cmt. a (2006) ("Whether a relationship is one of agency is a legal conclusion made after an assessment of the facts of the relationship and the application of the law of agency to those facts."); William A. Gregory, *The Law of Agency and Partnership* § 30.3, at 30 (2d ed. 2001) ("[A]gency and authority may be proved by any relevant facts."), and the court has had no occasion to make any findings of fact respecting whether an agency relationship exists or existed between the Department of the Interior and the Communities. Indeed, as the court has previously pointed out, the circumstances under which the 1886 lands and monies were transferred to the Communities has not been addressed in any detail. *See Wolfchild I*, 62 Fed.Cl. at 533 (discussing Letter from David Granum, Acting Area Director of the Bureau of Indian Affairs to Leon Columbus, Chairman, Community Council, Lower Sioux Community (Jan. 15, 1981), and Letter from Elmer T. Nitzschke, Field Solicitor, to Edwin Demery, Area Director (Feb. 6, 1981)). In issuing a summary judgment in *Wolfchild I* that a trust was formed and that the government had breached that trust, the court was satisfied beyond dispute *only* that real property and cash had been transferred from the Department to the Communities. *Wolfchild I*, 62 Fed.Cl. at 533. The agency question suggested by the government consequently cannot be certified for interlocutory appeal because it neither has been decided by this court nor is a question of law, let alone a controlling question.

■ The second question relating to the effect of the 1980 Act on the trust is a relatively straightforward question of law. The terms of the 1980 Act provide a basis for deciding that question. As the court observed in *Wolfchild I*, the 1980 Act contains no language of termination, and, indeed, it explicitly preserves aspects of the preexisting trust arrangement established by the Department. 62 Fed.Cl. at 543. The second

question accordingly could be certified, if the other criteria in Section 1292(d)(2) were to be met. *See AD Global Fund, LLC v. United States,* 68 Fed.Cl. 663, 664–65 (2005).

The first question respecting trust creation is complicated by the fact that the terms of the 1888, 1889, and 1890 Appropriation Acts are crucial, along with the terms of, and experience under, the earlier 1863 Act, but the implementation of those Acts by the Department of the Interior also has a strong role. *See Wolfchild I,* 62 Fed.Cl. at 541–42. In connection with the decisions rendered in *Wolfchild I* and *Wolfchild II,* the parties collected and submitted for the court's consideration a large volume of documents related to implementation. In the circumstances, the question of whether a trust exists is a question of law with attendant factual underpinnings. *See Restatement (Third) Trusts,* § 2 cmt. f, at 21 (2003) ("In the strict, traditional sense, a trust involves three elements: (1) a trustee, who holds the trust property and is subject to duties to deal with it for the benefit of one or more others; (2) one or more beneficiaries, to whom and for whose benefit the trustee owes the duties with respect to the trust property; and (3) trust property, which is held by the trustee for the beneficiaries."). Trusts created by statute may be governed by terms established in the statute or by general trust law. *See Restate-ment (Third) Trusts,* § 4, cmt. g, at 41 ("Some forms of trusts that are created by statute, especially public retirement systems or pension funds, and sometimes public land trusts, school land trusts, or trusts for benefit of native populations, are administered as express trusts, the terms of which are either set forth in the statute or are supplied by the default rules of general trust law."). The court was satisfied with the statutory and agency-implementing underpinnings and granted summary judgment in plaintiffs' favor on the issue. *Wolfchild I,* 62 Fed.Cl. at 540–42.[15] Accordingly, that question could be certified for interlocutory appeal.

Both the first and second questions are "controlling" in the sense that the existence of a trust and the absence of a statutory termination of that trust " 'materially affect' issues remaining to be decided in the trial court." *Marriott Int'l,* 63 Fed.Cl. at 145 (quoting *Pikes Peak Family Housing, LLC v. United States,* 40 Fed.Cl. 673, 686 (1998)); *see also Jade Trading, LLC v. United States,* 65 Fed.Cl. 443, 447 (2005) (controlling question of law not presented by nonparty discovery issue).

The second criterion, whether "there is a substantial ground for difference of opinion," is arguable. This is a case of first impression. Strong indicia of the existence of a trust are present. The Appropriation Acts

---

**15.** The Appropriation Acts stated the grants for the benefit of the loyal Mdewankanton in terms that satisfied the common law elements for formation of a trust, *see supra,* at 475 n. 3, but did not explicitly use the word "trust." *See Wolfchild I,* 62 Fed.Cl. at 540–41 (quoting *United States v. White Mountain Apache Tribe,* 537 U.S. 465, 474 n. 3, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003)). The Department of the Interior used the word "trust" in its implementing documents issued thereafter. *Id.* at 529–30, 541–42 (quoting among other documents, the Indian Land Certificates issued to loyal Mdewakanton, the earliest of which in this record was dated June 1, 1905, as well as a Memorandum from the Acting Associate Solicitor for Indian Affairs to the Commissioner of Indian Affairs (Mar. 19, 1974), and a letter from the Field Solicitor to the Minneapolis Area Director of the Bureau of Indian Affairs (Nov. 8, 1978)).

Arguably, the Appropriation Acts themselves allowed, but did not require, that a trust be created. A mechanism different from a trust for aiding the loyal Mdewakanton might have satis-fied the terms of the Appropriation Acts. However, the terms of the Appropriation Acts fit comfortably within a trust regime, and the Department of the Interior chose that mechanism for its implementation. As the Federal Circuit recently stated, "[w]here the government exercises actual control within its authority, neither Congress nor the agency needs to codify such actual control for a fiduciary trust relationship that is enforceable by money damages to arise." *Navajo Nation v. United States,* — F.3d —, —, 2007 WL 2685641, at *14 (Fed.Cir.2007) (citing *White Mountain Apache,* 537 U.S. at 475, 123 S.Ct. 1126) (finding "a fair inference that an obligation to preserve the property improvements was incumbent on the United States as trustee" where the government exercised its discretionary authority to supervise and occupy property); *United States v. Mitchell,* 463 U.S. 206, 225, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) ("[W]here the Federal Government takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists with respect to such monies or properties (unless Congress has provided otherwise).").

themselves reflect the common law elements of a trust. *Wolfchild I*, 62 Fed.Cl. at 540–41. From the early days of implementation forward, the Department of the Interior used the term "trust" in the Indian Land Certificates employed to convey possessory rights in parcels of the 1886 lands to lineal descendants. *See id.* at 529 (quoting Indian Land Certificate of Harry Bluestone (June 1, 1905)). And, subsequent statutes accorded the disposition of small parcels of the 1886 lands as deserving of treatment typically accompanying the partial termination of a trust. *See id.* at 529, 541 (discussing the Act of Feb. 25, 1901, 31 Stat. 805, 806, ("1901 Act"), provisions of which required the consent of beneficiaries for the disposition); *Wolfchild II*, 68 Fed.Cl. at 787–88 (addressing the 1901 Act along with principles set out in *Restatement (Third) of Trusts* § 65 (2003) (requirements for termination of a trust)), 789–90 (analyzing the Act of June 13, 1944, Pub.L. No. 78–335, 58 Stat. 274, which also provided for disposition of a parcel of the 1886 lands). Nonetheless, the conclusion that a trust was created involved the analysis and assessment of a number of statutes and many implementing steps taken over a span of 90 years. In these circumstances, the court accords some weight to the government's desire to present its arguments to the court of appeals at this juncture and concludes that the second criterion has been sufficiently satisfied.

The third consideration is discretionary, turning on whether certification "*may* materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(d)(2) (emphasis added). Here, there is no doubt that the question of the existence, and continued existence, of a trust is at the heart of this litigation and that a ruling by the court of appeals on the trust issues would advance the resolution of the disputed matters.

As a result, the court concludes that certification for interlocutory appeal of the first two questions posed by the government is appropriate, as part of *this order, not* the prior orders issued in October 2004, December 2005, and August 2006. Good cause has not been shown to amend the prior orders, and they will remain undisturbed. As this opinion plainly indicates, the court continues to adhere to its prior rulings and to apply them in continuing proceedings in this litigation. The two questions thus certified relate to creation of a trust in connection with and as a consequence of the implementation of the Appropriation Acts by the Department of the Interior, and the continued existence of that trust after the 1980 Act. The question of agency proposed by the government is not certified.

Because the government's motion to certify orders is in many respects untimely, and because the parties have expended substantial resources in developing and addressing the party-related issues as a preamble to reaching this point, the court will not stay proceedings while the government petitions the court of appeals to grant interlocutory appeal of the two certified questions.

As Judge Posner pointed out in *Weir*, this court's jurisdiction is not displaced by a petition to grant an interlocutory appeal. *See* 915 F.2d at 286 ("An interlocutory appeal normally interrupts the trial even though it does not suspend the trial court's jurisdiction."). Discovery and other preparatory steps will accordingly proceed under the schedule being adopted by and with this opinion and order. However, if the court of appeals should grant an interlocutory appeal, then the proceedings in this court shall be stayed beginning with the date of such grant. *See* 28 U.S.C. § 1292(d)(3) ("Neither the application for nor the granting of an appeal under this subsection shall stay proceedings in the Court of International Trade or in the Court of Federal Claims, as the case may be, unless a stay is ordered by a judge of the Court of International Trade or of the Court of Federal Claims or by the United States Court of Appeals for the Federal Circuit or a judge of that court.").

## CONCLUSION

In accord with RCFC 16(b) and RCFC Appendix A, ¶¶ 7–8, discovery and further pretrial steps shall proceed in accord with the following schedule:

| Event | Deadline |
|---|---|
| Schedule | |
| initial disclosures | November 1, 2007 |
| initial interrogatories and document disclosure requests | November 20, 2007 |
| disclosure of names of expert witnesses | December 28, 2007 |
| production of expert reports | February 1, 2008 |
| production of rebuttal expert reports | March 11, 2008 |
| conclusion of fact discovery [16] | March 28, 2008 |
| conclusion of expert discovery | April 30, 2008 |
| submission of any motions for summary judgment (except for cross-motions) | May 30, 2008 |

The motions to amend pleadings filed by the Garreau (Hall) group [523], Anonymous Blair (Renaud) group [528, 529], Burley group [532], Anonymous Walker group [521–22, 534–537], Whipple group [538], Lafferty group [539], Lowe group [540], Kitto group [541], Enyard group [542], Zephier group [543],[17] Mozak group [547], Ferris group [551], Henry group [553], Trudell group [554], and Vassar group [555] are GRANTED. The motions to amend filed by plaintiffs [567] and by the Rocque group [524], Julia DuMarce group [545], Vadnais group [558], and Marvel DuMarce group [560] are GRANTED IN PART and DENIED IN PART.[18] They are granted insofar as they seek to add as plaintiffs and intervening plaintiffs newborns and persons already granted intervention as prior members of the extended Felix group.[19] In other respects, those motions are denied, and defendant's corresponding motions to strike in part [606, 587] plaintiffs's Fifth Amended Complaint [567] and the amended complaint proffered by the Rocque group [524] are GRANTED IN PART. The motion for leave to intervene by the Werner [St. Clair] group [548] is DENIED, without prejudice to the filing by that group of an original complaint in a separate action. The motion to clarify filed by the extended Felix group [506] is DENIED as moot.

Defendant's motion to certify orders for interlocutory appeal [510] is GRANTED IN PART and DENIED IN PART. That motion is granted insofar as the court certifies for interlocutory appeal the following two questions in connection with *this* order:

(1) Whether a trust was created in connection with and as a consequence of the 1888, 1889, and 1890 Appropriations Acts for the benefit of the loyal Mdewakanton and their lineal descendants, which trust included land, improvements to land, and monies as the corpus; and

(2) If the Appropriations Acts created such a trust, whether Congress terminated that trust with enactment of the 1980 Act.

The motion in all other respects is denied. This court's proceedings shall *not* be stayed pending the government's filing of a petition with the court of appeals for interlocutory appeal, except that a stay shall automatically come into force if and when the court of appeals should grant interlocutory appeal.

IT IS SO ORDERED.

---

16. Contrary to plaintiffs's request, there shall be no bar on depositions of individual plaintiffs or intervening plaintiffs absent court order. Instead, discovery including depositions shall proceed in accord with RCFC 26–37. If any discovery requests prove to be oppressive or unduly burdensome, the court will entertain a motion for a protective order under RCFC 26(b).

17. For good cause shown, the grant of the Zephier group's motion includes the addition as an intervening plaintiff of one person who is not a newborn. *See* Hr'g Tr. 27:23 to 28:10.

18. Nancy Smith should be included within the Rocque group because she was listed in that group's initial complaint in intervention but was mistakenly deleted from the subsequently amended complaints. *See* Response of Rocque Group to Def.'s Mt. to Strike [620] at 4.

19. In addition, plaintiffs and the Henry and Trudell groups of intervening plaintiffs shall provide for each minor plaintiff or intervening plaintiff a listing in electronic format of the minor's name, the adult plaintiff appearing as parent or guardian of the minor, and the particular capacity in which the adult is acting, *e.g.*, parent, guardian, etc.